UNITED CALIFORNIA BANK, Plaintiff,

v.

EASTERN MOUNTAIN SPORTS,
INC., Defendant.

Civ. A. No. 78–1099–K.

United States District Court,
D. Massachusetts.

March 31, 1982.
Supplemental Opinion July 15, 1982.

948

Csaplar & Bok, Margaret Marshall, Boston, Mass., for plaintiff.

Charles E. Goodhue, Samuel L. Batchelder, Jr., Jon D. Schneider, Anthony M. Feeherry, Goodwin, Procter & Hoar, Boston, Mass., for defendant.

Opinion

KEETON, District Judge.

This action was tried before the court without a jury. Findings of fact are stated in parts II–V of this opinion. Conclusions of law and evaluative findings of mixed fact and law are stated in parts VI–XI. Undisputed background facts and the contentions of the parties are summarized in part I.

I.

*Nature of the Case*

Plaintiff, United California Bank ("UCB"), is a California banking corporation organized under the laws of California, having its principal place of business in Los Angeles. Defendant Eastern Mountain Sports, Inc. ("EMS") is a corporation organized and existing under the laws of Massachusetts, with its corporate headquarters in Peterborough, New Hampshire. This court has jurisdiction of this action because of diversity of citizenship.

At all times material to this lawsuit, UCB has been engaged in the business of general banking. EMS is, and at all times relevant to this action has been, in the business of retail sales of garments, equipment, and other accessories used in camping, hiking, skiing, mountaineering, and other sports. UCB sues as assignee of accounts receivable of Snow Lion Corporation ("Snow Lion"), a winter-clothing manufacturer located in California, to recover from EMS amounts allegedly owing to Snow Lion for goods sold by Snow Lion to EMS. Near the close of trial the parties agreed that the amount EMS owes UCB on the unpaid invoices from the EMS-Snow Lion account is $265,-979.77. UCB claims 18% interest on this amount.

EMS asserts three offsets to UCB's claim. First, EMS contends that certain goods labeled as "down" sold to EMS by Snow Lion were defective, causing EMS lost profits and consequential damages allowable under Mass.Gen. Laws Ann. ch. 106 [UCC],

§§ 2–714 and 2–715. Second, EMS argues that two different sets of advertising credits were agreed upon by Snow Lion but never issued to EMS. Third, EMS states that certain goods filled with synthetic fibers purchased from Snow Lion were defective and were delivered late, causing EMS additional losses. EMS asserts that each of its claims for offsets accrued before UCB notified EMS of the assignment and that therefore, under Mass.Gen. Laws Ann. ch. 106 [UCC], § 9–318(1)(b), these offsets to claims of Snow Lion are valid against UCB as assignee of Snow Lion. EMS argues in the alternative that, because its claims arise from the terms of the contract between EMS and Snow Lion, they may be asserted under Mass.Gen. Laws Ann. ch. 106 [UCC], § 9–318(1)(a) as offsets against UCB's claim. In support of this argument, EMS contends that the course of dealing between the parties was to treat the EMS-Snow Lion account as a single contract, or "running account," allowing EMS to offset credits issued by Snow Lion against any outstanding invoices, whether or not those credits and invoices related to similar transactions. The amount of offsetting damages and credits claimed by EMS is $275,327.41.

UCB responds to the claimed offsets in three ways. First, UCB contends that in November of 1977 Snow Lion and EMS reached an accord and satisfaction of any claims or defenses arising out of the sale of the defective down goods, and therefore EMS is barred from asserting its claims regarding these goods. Second, UCB argues that the claims of EMS for offsets did not accrue before notice of assignment and therefore cannot be asserted under Mass. Gen. Laws Ann. ch. 106 [UCC], § 9–318(1)(b). Finally, UCB contends that each of the 189 invoices to which the unpaid amounts correspond constitutes a separate contract and that EMS raised objections to the stated amounts of only two of these invoices. Thus, UCB asserts, EMS has no valid defense as to amounts due on 187 of the invoices and cannot offset its claims on the two to which it did raise objection against amounts owed to UCB on the remaining 187 invoices or contracts.

The parties have agreed that the law of the Commonwealth of Massachusetts applies to every aspect of this controversy.

II.

*Nature of the Relationships Among UCB, EMS and Snow Lion*

During the period from May 19, 1975 through January of 1978, EMS and Snow Lion had a continuing business relationship. Pursuant to a series of purchase orders placed by EMS, Snow Lion sold and delivered to EMS various goods including garments and other items filled with "down" (*i.e.,* goose down and/or duck down), as well as garments and other items insulated with synthetic fibers. Snow Lion's sales to EMS accounted for a substantial portion of Snow Lion's business.

Snow Lion maintained an audit system for billing its customers by means of invoices, credit memos, and regular monthly statements. When Snow Lion accepted an order and shipped merchandise to a customer, it simultaneously provided the customer with an invoice setting forth the charges for the merchandise. If a customer objected to a particular invoice and Snow Lion verified the objection, the account was modified by means of an adjustment. In most cases the adjustment was reflected by means of a credit memo issued by Snow Lion and by adjustment entries on the monthly statement issued by Snow Lion. These monthly statements recapitulated all transactions—including invoices, credits, and payments—between Snow Lion and the customer and stated the total amount due Snow Lion on the account.

The evidence shows that Snow Lion did not automatically apply payments or credits to a customer's current or oldest invoices. An information sheet on billing issued by Snow Lion to its customers directed each customer to specify, when making a pay-

ment, the particular invoice to which the customer wanted the payment to apply. In addition, if the customer had received a credit memo, the customer was directed to state the invoice to which the customer wanted the credit applied. *See* Exhibit 31.

Snow Lion's relationship with EMS was no different from its relationship with other customers, and Snow Lion followed these billing practices on its account with EMS. From time to time EMS would seek adjustments of particular invoices and if the adjustments were granted, a credit memo would usually be issued by Snow Lion. The course of dealing between Snow Lion and EMS was such that, if Snow Lion issued credits on a particular transaction after EMS had already paid the invoice reflecting that transaction, Snow Lion would allow EMS to apply the credits against unpaid invoices relating to other transactions. *E.g.*, Deposition of William Simon, at 43–44, 53; Tr. II–4–5.

UCB's relationship with Snow Lion began on or about March 18, 1977, when Snow Lion and the bank entered into an accounts receivable financing agreement, the terms of which are set forth in a Security and Loan Agreement. Exhibit 1. Under this agreement, UCB undertook to lend Snow Lion an amount not greater than 85% of the net amount owing on Snow Lion's accounts receivable. As security for the loan, Snow Lion gave UCB a security interest in, among other things, all of Snow Lion's accounts receivable and other contract rights existing at the time a given loan was made or arising thereafter. On June 9, 1977, UCB perfected its security interest in the accounts receivable of Snow Lion by filing a financing statement with the Secretary of State of the State of California.

The agreement between UCB and Snow Lion operated on a "revolving credit" arrangement. Snow Lion invoices issued to customers were forwarded to UCB, and UCB added the face amount of these invoices to a record it kept of the balance of outstanding Snow Lion invoices. Periodi-

cally, Snow Lion would request from UCB an advance or a loan of funds. At the discretion of UCB and on the condition that the total amount of loans to Snow Lion did not exceed at any given time 85% of the net amount owing on Snow Lion's accounts receivable, UCB periodically increased its loans to Snow Lion as requested. The total balance of the loan outstanding from UCB to Snow Lion, like the amount of Snow Lion's outstanding accounts receivable, was recorded from time to time by UCB. Under the terms of the Security and Loan Agreement, all collection costs incurred by UCB were added to the balance owed by Snow Lion to UCB.

Beginning sometime in early June, 1977, UCB informed all customers of Snow Lion in writing that all of their accounts then owed or thereafter owed to Snow Lion had been transferred and assigned to UCB. On June 14, 1977, by letter, UCB sent a notice of assignment to EMS and directed EMS to make all future payments on its Snow Lion account directly to UCB. The letter also requested EMS's acknowledgment of the assignment. Exhibit C. On June 15, 1977, EMS received the letter from UCB, and on July 5, 1977 EMS acknowledged receipt of the notice of assignment by signing the letter and returning it to UCB. Exhibit D.

After June 27, 1977, EMS made all payments on the outstanding balance of its Snow Lion account as directed by UCB. EMS forwarded to UCB checks made payable to "Snow Lion/United California Bank."

### III.

### *Shipments of Defective Merchandise*

#### A. Chevron Vests

On or about March 29, 1977, Snow Lion delivered to EMS in Boston pursuant to a previous order a total of 8,000 down-filled Adult Chevron Vests and 2,000 down-filled Child's Chevron Vests. The Snow Lion invoice evidencing this shipment reads in pertinent part as follows:

| Model No. | Quantity Ordered | Shipped | Description | Price | Amount |
|---|---|---|---|---|---|
| 160333 | 8,000 | 2,000 | Chevron Vest | 13.70 | $109,600 |
| 160341 | 8,000 | 2,000 | Child's Chevron Vest | 10.50 | 21,000 |
| | | | | Total: | $130,600 |

The Chevron Vests were labeled as "down" garments and, as requested by EMS, carried an EMS label.

When the goods arrived in Boston, Mr. Caleb Canby, who was then in charge of purchasing at EMS, noted that the packaging arrangement for the vests was of a type he had never previously observed. Each vest was rolled and packed in a nylon sack. The vests were also damp. Mr. Canby attributed this dampness to the fact that the goods had traveled by sea to Boston.

In addition to these packing and shipping problems, Mr. Canby observed that the vests had very little loft—in other words, they were not "thick" but "flat." The loft or thickness of a down-filled garment is an indication of the garment's ability to keep the wearer warm. For some time prior to 1977, EMS had focused in its advertising and mail order catalogs on loft as an item of consumer interest and as a measure of the insulating ability and therefore the quality of a down-filled garment or sleeping bag.

Mr. Canby also noticed that the Chevron Vests were overcalendarized (i.e., the nylon exteriors of the vests were "shiny" and "brittle"). Calendarization is a process by which nylon is made "down proof" so as to keep the down insulating materials within the garment.

Shortly after these Chevron Vests arrived at EMS, Mr. Canby brought the condition of the vests to the attention of Snow Lion by telephoning Mr. Gutram Jordan at Snow Lion. A cable describing the packing problem was also sent to Mr. William Simon at Snow Lion. E.g., Exhibit YY at 7; Deposition of William Simon, at 14, 21; Deposition of Caleb Canby, at 13–15; Tr. II–53.

B. Northern Light Parkas

On or about April 6, 1977, Snow Lion delivered to EMS in Boston pursuant to a previous order a total of 1,021 down-filled Northern Light Ripstop Parkas and 982 down-filled Northern Light Taffeta Parkas. The Snow Lion invoice reflecting this shipment provides in pertinent part as follows:

| Model No. | Quantity Ordered | Shipped | Description | Price | Amount |
|---|---|---|---|---|---|
| 300R | 1008 | 1008 | Northern Light Ripstop | $48.50 | $48,888 |
| 300S | 1008 | 1008 | Northern Light Super [Taffeta] | $51.50 | $51,912 |
| | | | | Total: | $100,800 |

The Northern Light Parkas were labeled as "down" garments, and they carried EMS's private label. Because only 2003 parkas were actually delivered, a credit in the amount of $708.50 was subsequently issued to EMS. Exhibit 10.

When these goods arrived at EMS, Mr. Canby observed that the parkas, like the Chevron Vests, were rolled and packed in nylon sacks. He also noted that the parkas were low in loft and that some of them were over-calendarized. Sometime in May, 1977, when Martin Stilling and John Bragg of Snow Lion visited EMS in Boston, EMS representatives complained to Snow Lion about the condition of the garments. Ex-

hibit YY at 7–8; Deposition of William Simon, at 17–18, 21–22, 61; Deposition of Caleb Canby, at 17–18; Tr. 25–27, 61–62.

## C. EMS Super Down Jackets

On or about April 18, 1977, Snow Lion delivered to EMS in Boston pursuant to a previous order a total of 3,022 down-filled Super-Down Jackets. The Snow Lion invoice evidencing this shipment provides in relevant part:

| Model No. | Quantity Ordered | Shipped | Description | Price | Amount |
|---|---|---|---|---|---|
| 20270 | 3024 | 3024 | EMS Super-Down Jacket | $31.00 | $93,744 |

There was a minor error regarding the shipment in that only 3022 items—two fewer than the number referred to in the invoice—were actually delivered.

Like the Chevron Vests and Northern Light Parkas, the Super-Down Jackets were labeled as "down" and marked with the EMS private label. They were packaged in the same unusual fashion in which the previous two shipments had been packaged: in a rolled condition in nylon pouches. They were also observed to have very little loft. By June 7, 1977, EMS notified Snow Lion of these problems with the goods. *E.g.,* Exhibit YY, at 8; Deposition of William Simon, at 19–20, 21, 61; Deposition of Caleb Canby, at 25–27; Tr. II–56–58.

## D. Waban Parkas

Sometime in November or December of 1977, Snow Lion delivered to EMS in Boston an order of Adult Waban Parkas, garments filled with synthetic fiber insulation and marked with the private EMS label. The shipment of the Waban Parkas arrived late, having been ordered by EMS from Snow Lion for delivery on or before April 1, 1977. On October 18, 1977, before the delivery of these parkas, EMS made a payment to Snow Lion that mistakenly made reference to the $59,400 invoice price of then undelivered Waban Parkas. Exhibit 5. Subsequently a credit memo was issued for this incorrect payment. When the parkas arrived, the shipment contained fewer garments than EMS had ordered. EMS in-

formed Snow Lion that the shipment was short, and the invoice was adjusted to reflect the fact that the shipment included 1850 garments with an invoice price of $29.70 for a total amount of $54,945.

Because the parkas were delivered late, Mr. Canby shipped them out to the various EMS retail stores immediately after they arrived. When he began to receive complaints about the quality of the garments from personnel in the stores, Mr. Canby went out to inspect the garments. He discovered at least two problems with the parkas: the nylon exteriors were over-calendarized, and the Polarguard bats with which they were filled were not uniform.

Sometime in December of 1977, EMS informed Snow Lion by telephone of the delivery and the condition of the parkas. In addition, in early to mid-January of 1978, when Barry Solloway and John Bragg of Snow Lion visited EMS headquarters in Peterborough, New Hampshire to discuss general business problems, Mr. McDonough of EMS discussed with them the defects in the Waban Parkas. Exhibit YY, at 10–11; Tr. II–72–74; Deposition of Alan McDonough, at 89–91; Deposition of Caleb Canby, at 79–81.

## IV. *Payments and Adjustments*

On June 7 and 8, 1977, Messrs. William Simon, Martin Stilling and John Bragg of Snow Lion met in Boston with Messrs. Canby, McDonough, and Roger Furst of EMS. EMS had complained to Snow Lion about the quality of the three recent shipments of down garments—the Chevron Vests, Northern Light Parkas, and Super Down Jackets. The purpose of the meeting between these

representatives of the two companies was to discuss the condition of these goods. By June 8, 1977, EMS had received the results of tests that had been performed on one of the Chevron Vests and one of the Super Down Jackets. The test results showed that the down in these two products had a poor lofting capacity or "filling power." Plaintiff does not dispute that the filling power of the vests and jackets did not conform to the contract specifications supplied by EMS to Snow Lion. Plaintiff's Amended Findings of Fact # 33 and # 35, at 13. *See also* Exhibits N, O; Deposition of Caleb Canby, at 29–30. The Northern Light Parkas lofted somewhat better than the vests and jackets, and by June 8, 1977, EMS had not had any tests conducted on the parkas.

At the June 7 and 8, 1977 meeting, the test results on the vests and jackets were shown to Snow Lion representatives. The discussion focused on the poor lofting ability and the over-calendarized exteriors of the garments. As a result of this meeting, Snow Lion agreed to give EMS the following credits: (1) $2.50 off the original invoice price on each of the Chevron Vests, for a total credit of $25,000 on the vests; and (2) $1.00 off the original invoice price on each of the Super Down Jackets, for a total credit of $3,024 on the jackets. No adjustment was made on the price of the Northern Light Parkas, but Snow Lion did agree to extended dating for the garments.

The credits granted at the June meeting were in the nature of initial credits. The selling season for these garments ran from approximately August through December, and in early June there was little way of telling for what price the goods could be sold or how many of them would sell. In addition, Mr. Simon suggested that the appearance and thus the marketability of the garments might improve if EMS were to dry and hang them, and EMS agreed to follow this suggestion. Throughout the negotiations, Mr. McDonough consistently stated that, although EMS had accepted delivery of the goods, EMS expected to maintain the gross dollar profit margin that it would have realized from the sale of the goods had they not been defective. Deposition of William Simon, at 30–31, 34, 95; Deposition of Caleb Canby, at 27, 66–68, 86–88; Tr. II–57–58, 59, 67–69.

A matter unrelated to the shipments of defective merchandise was also discussed at the meeting on June 7 and 8, 1977. Sometime in 1975 or 1976, Snow Lion had agreed to reimburse EMS for costs incurred in advertising Celanese Polarguard products in EMS' semi-annual catalogs. The credit arrangement agreed upon was as follows: after displaying the Polarguard products in its catalogues, EMS was to provide Snow Lion with documentation of the advertising and its costs; Snow Lion would then submit the credit claim and documentation to Celanese Corporation, the manufacturer of Polarguard; after Celanese paid Snow Lion the submitted amount, Snow Lion was to reimburse EMS by issuing a credit to EMS for the amount Snow Lion had received from Celanese. Deposition of William Simon, at 44–46, 90–91; Tr. II–81–82, III–22, 23, 171.

Credits for advertising undertaken before June, 1977 became a topic of discussion at the June 7 and 8 meeting. Mr. McDonough pointed out that EMS had not received credit for advertising costs incurred in previous years and requested a $35,000 advertising credit from Snow Lion. After negotiation, Mr. Simon agreed to grant EMS a credit in the amount of $25,000. Simon agreed to give EMS the $25,000 advertising credit whether or not EMS submitted documentation of its costs and whether or not Celanese paid Snow Lion this amount. Deposition of William Simon, at 88–91; Tr. II–82–84, III–24–26.

Subsequently, on June 27, 1977, EMS made a payment to Snow Lion. As previously directed by UCB and Snow Lion, EMS mailed a check for $258,166, made payable to Snow Lion/United California Bank, to United California Bank, P.O. Box 39185 RINCON Annex, San Francisco, California

94139. This payment by EMS made specific reference to the invoices for the Chevron Vests and Super Down Jackets and to the $25,000 and $3,024 credits against those invoices agreed to on June 7 and 8, 1977 but not yet issued by Snow Lion. Exhibit 4.

On September 12, 1977, Snow Lion confirmed its agreement to the credits on the Chevron Vests and Super Down Jackets by issuing two credit memos to EMS. The credit memos provided in pertinent part as follows:

9/12/77 Defective Merchandise on Invoice No. 37682 $25,000

9/12/77 Defective Merchandise on Invoice No. 39661 $3,024

Exhibits 13 and 14.

After drying, hanging, and fluffing many of the down garments as suggested by Snow Lion, EMS attempted during the summer and fall of 1977 to sell the goods in its retail stores and through its mail order catalogs. EMS experienced problems in selling the goods, however, and continued to register complaints with Snow Lion. On or about August 8, 1977, EMS received the results of a test it had commissioned on a sample from the Northern Light Parkas. The test results confirmed that the filling power or lofting capacity of the parkas, like the vests and jackets, was below the contract specifications supplied by EMS to Snow Lion. Plaintiff's Amended Findings of Fact # 32, at 12; Exhibit P. See also Deposition of Caleb Canby, at 29–30.

Sometime in early November, 1977, Messrs. Simon and Stilling traveled to EMS's new headquarters in Peterborough, New Hampshire and met with representatives of EMS, including Messrs. McDonough and Canby. Following negotiations between the parties, Snow Lion agreed to issue further credits on the defective down products, resulting in final prices on the garments as follows: (1) $8.00 for each Adult Chevron Vest; (2) $5.70 for each Child's Chevron Vest; (3) $24.50 for each Super Down Jacket, to be reduced to $19.50 for each jacket if EMS was unable to sell substantial quantities (around 60%) of the jackets; (4) $47.50 for each Northern Light Ripstop Parka; and (5) $50.50 for each Northern Light Taffeta Parka. Tr. 67, 70; Exhibit YY, at 9–10.

Again at the November meeting, as at the meeting of June 7 and 8, 1977, Mr. McDonough reiterated his position that EMS expected to maintain the gross dollar profit margin it would have realized on the sale of these garments as warranted. Deposition of William Simon, at 95; Deposition of Caleb Canby, at 86–88; Tr. II–67–69.

Another matter of concern to EMS was discussed at the November meeting. In October of 1977, Snow Lion and a number of other manufacturers had been indicted in California for selling illegal down. When Mr. McDonough asked Mr. Simon about the nature of the litigation in California—specifically, whether or not it would be a problem for EMS, Mr. Simon assured McDonough that EMS had nothing to worry about. Simon stated that "it was a mistake," that "the tests had been done too harshly," and that Snow Lion's "down was as good as everybody else's down." Tr. II–79, III–12–13; Deposition of Caleb Canby, at 40.

On January 6, 1978, Snow Lion issued a credit memo to EMS in the amount of $54,-005.40. Although both parties agree that the memo was intended to memorialize the credits granted at the November, 1977 meeting on all three sets of down garments, the credit memo referred only to "defective merchandise regarding invoice # 37682." Exhibit 17. Invoice 37682, which had already been paid by EMS, was the invoice pertaining to the delivery of the Chevron Vests.

## V.

### Failure of Down Goods to Conform to FTC Guidelines

On or about January 11, 1978, the Attorney General's Office of the State of Maine

analyzed samples from an EMS store in Maine of the Chevron Vests (Adult and Child's), Northern Light Parkas, and Super Down Jackets. The test results showed that these samples did not meet Federal Trade Commission ("FTC") requirements for goods labeled as "down." At all relevant times in 1977 and 1978, the FTC guidelines for down content for goods labeled as "down" provided in pertinent part as follows:

16 C.F.R. § 253.6 *Tolerances in filling material.*

(a) *Down products.* The term "down" may be used to designate any industry product containing the following filling material:

| | Percent |
| --- | --- |
| (1) Down plumules, and down fiber (minimum) | 80 |
| Consisting of: | |
| Down and plumules (minimum) | 70 |
| Down fiber (maximum) | 10 |
| (2) Remainder | 20 |
| Consisting of: | |
| Down fiber, waterfowl, feather fiber and waterfowl feathers, and— | |
| Nonwaterfowl feathers and nonwaterfowl feather fiber (maximum) | 2 |
| Residue (maximum) | 2 |

(b) *Waterfowl feather products.* The term "waterfowl feathers" may be used to designate any plumage product containing the following filling material which is free of quill and crushed feathers:

| | Percent |
| --- | --- |
| Waterfowl feathers (minimum) | 80 |
| Nonwaterfowl feathers (maximum) | 8 |
| Residue (maximum) | 2 |

Shortly after January 11, 1978, EMS received notification from the Attorney General's Office of the State of Maine of the results of the tests conducted on the goods EMS had purchased from Snow Lion. Upon receiving this notification, EMS removed its Snow Lion Chevron Vests, Super Down Jackets, and Northern Light Parkas from sale to the public and had independent tests conducted on the garments. The results of these tests confirmed that the goods did not conform to the FTC requirements and thus were mislabeled as "down." Exhibits R–V. When Mr. Salloway and Mr. Bragg of Snow Lion came to EMS headquarters in Peterborough, New Hampshire in early to mid-January of 1978, Mr. McDo-

nough informed them about the results of the investigation by the Attorney General's Office of the State of Maine. Tr. III–33–35; Exhibit YY, at 11.

On February 3, 1978, EMS entered into an Assurance of Discontinuance with the Attorney General's Office of the State of Maine. The Assurance of Discontinuance states in relevant part:

Pursuant to the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 206 *et seq.,* the Office of the Attorney General has investigated allegations that Valley Sports, Inc., d/b/a Eastern Mountain Sports, Inc., was offering for sale parkas and other garments labelled as down or down-filled, when, in fact, such garments did not contain at least 80 percent down and down fiber as required under Federal Trade Commission regulations for the feather and down products industry, effective December 29, 1971, and published at 16 CFR 253. The Office of the Attorney General has found these allegations to be supported as to the following garments:

Eastern Mountain Sports Super Sweater

Eastern Mountain Sports Northern Light Parka

Eastern Mountain Sports Taiwanese Chevron Vests

Eastern Mountain Sports Taffeta Bugaboo (Mongol) Parka

Valley Sports, Inc., d/b/a Eastern Mountain Sports, Inc., pursuant to 5 M.R.S.A. § 210, acknowledges that the insulation of some of said garments does not reach the required 80 percent of down and down fiber and that such garments were sold by them.

The Assurance of Discontinuance that EMS entered into with the Attorney General's Office of the State of Maine also provides as follows:

Valley Sports, Inc., d/b/a Eastern Mountain Sports, Inc., stipulates and agrees to conduct a recall program of the

garments noted above and any other down products which it discovers contain less than the required 80 percent down and down fiber with due regard for variances attributed to testing error. Said recall program shall allow customers who purchased garments from job lots in which defective garments have been discovered, to return these garments for a full refund of their purchase price. Said recall program shall be conducted by writing to all Maine customers who purchased the garments by catalog sales, all Maine customers who appear on Eastern Mountain Sports retail customer list, and by placing appropriate ads at least one quarter of a page in size and appearing on at least two separate occasions in Maine papers where Eastern Mountain Sports has previously advertised in Maine.

Thereafter, EMS engaged in a nationwide recall program in all the market areas where EMS's sixteen retail stores were then located. In all the newspapers in the areas where EMS habitually advertised, a recall notice was prepared and run on two separate occasions during the first week of February, 1978. Where the Sunday paper was a different publication from the daily, EMS ran a recall notice on two consecutive Sundays. Each notice exceeded slightly the size of a one-quarter page advertisement. *See* Exhibit 30.

Each EMS store maintains a list of local retail customers who have requested to have their names on the list. A recall notice flyer substantially similar in format to the notice published in the newspapers was mailed to each customer whose name appeared on an EMS list. In addition, a recall notice was sent to each mail order customer shown on EMS's records to have purchased one of the defective down garments between the appropriate dates. Although the recall notices stated a cut off date of March 1, 1978 for returning the offending articles, EMS made refunds or adjustments for the few returned articles that came in after that date.

The direct costs related to the EMS recall are as follows:

| | | | |
|---|---|---|---|
| A. | Recall Flyer (145,000) | | |
| | – printing/prep. | $ 3,507.05 | |
| | – postage | 10,744.51 | |
| | – labels | 900.82 | |
| | | | $15,152.38 |
| B. | Newspaper Advertising | | |
| | – typesetting | $ 129.80 | |
| | – ad placement | 12,377.10 | |
| | | | $12,506.90 |
| C. | Office and processing | | |
| | – supplies | $ 1,372.04 | |
| | – employee hours | 520.00 | |
| | – TOTAL | | $ 1,892.04 |
| | | | $29,551.32 |

Tr. III–158–161; Exhibit YY, at 18–19. Of the six items included in the recall, only four—the Adult Chevron Vests, the Child's Chevron Vests, the Northern Light Parkas, and the Super Down Jackets—were manufactured by Snow Lion. Refunds made to customers on the defective Snow Lion garments totaled approximately $12,340.13. Tr. III–161–163.

After EMS entered into the Assurance of Discontinuance with the Attorney General's Office of the State of Maine, EMS sold most of the remaining Chevron Vests, Super Down Jackets, and Northern Light Parkas as "seconds" in its bargain basement store in Boston. Signs informing customers that the articles did not conform to FTC guidelines for goods labeled as "down" were placed on the garments, which sold at substantially reduced prices. *E.g.,* Tr. III–104–105. After the events of January, 1978, EMS withheld payment to Snow Lion/UCB on EMS's account with Snow Lion, including amounts owed on the sale of the Northern Light Parkas and Waban Parkas.

## VI.

### *Breach of Warranty or Contract Claims Arising Out of Sale of Down Goods*

#### A. Existence of Breaches

It is uncontroverted in this case that EMS accepted the Chevron Vests, Northern Light Parkas, and Super Down Jackets purchased from Snow Lion. The legislature of

the Commonwealth of Massachusetts has enacted the Uniform Commercial Code, the controlling provision of which provides that "the burden is on the buyer to establish any breach with respect to goods accepted." Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(4). UCB does not dispute that the three shipments of down goods sold by Snow Lion to EMS contained the following two defects: (1) the filling power or lofting capacity of the merchandise failed to conform to the contract specifications for filling power or lofting capacity; and (2) the down content of all three sets of garments failed to conform to FTC guidelines for products labeled as "down." In addition, I find that at least the Chevron Vests and Northern Light Parkas were defective in that their nylon exteriors were over-calendarized.

I conclude that each of these defects constituted a breach of contract or warranty, express or implied. First, by failing to ensure that the three shipments of merchandise conformed to contract specifications for filling power or lofting capacity, Snow Lion violated the contracts or express warranties for the goods. Mass. Gen.Laws Ann. ch. 106 [UCC], § 2–313(1)(b). Second, by selling EMS down garments that failed to meet applicable FTC guidelines for products labeled as "down," Snow Lion violated the implied warranties of merchantability for the Chevron Vests, Northern Light Parkas, and Super Down Jackets. As these goods carried "down" labels, they were warranted by Snow Lion to contain the down content prescribed by federal law for products bearing those labels. Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–314(2)(f). Finally, the implied warranties of merchantability for the Chevron Vests and Northern Light Parkas were violated by reason of the over-calendarization, which rendered the goods incapable of passing without objection in the winter clothing market. Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–314(2)(a).

### B. Adequacy of Notice

Massachusetts law provides that, in order to recover damages caused by any breach of contract or warranty, a buyer who accepts non-conforming goods must notify the seller of the breach within a reasonable time after the buyer discovers or should have discovered the breach. Mass.Gen.Laws Ann. ch. 106 [UCC], §§ 2–607(3)(a), 2–714(1). The leading decision by the Supreme Judicial Court of Massachusetts construing Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(3)(a) is *Nugent v. Popular Markets, Inc.,* 353 Mass. 45, 228 N.E.2d 91 (1967). In *Nugent,* the Supreme Judicial Court held that the standard for what constitutes adequate notice of breach under § 2–607(3)(a) was intended to be less rigorous, at least as applied to a retail consumer rather than a "merchant buyer," than that required by § 38 of the former Massachusetts Sales Act, which was superseded by the Uniform Commercial Code. In reaching this conclusion, the court relied on and quoted from the official comment to § 2–607(3)(a):

> The time of notification is to be determined by applying commercial standards to a merchant buyer. A 'reasonable time' for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer . . . . Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

Uniform Commercial Code, 1962 Official Text with Comments, § 2–607 comment 4, *partially quoted in Nugent,* 353 Mass. at 48–49, 228 N.E.2d at 93–94.

Comment 4 to the Uniform Commercial Code indicates that § 2–607(3)(a), as applied to merchant buyers, is intended to serve two underlying purposes: encouraging compromise between the parties and promoting good faith in commercial dealings. *See T. J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338, 360 & n. 46 (5th Cir. 1980), *quoting Eastern Air Lines v. McDonnell Douglas Corp.,* 532 F.2d 957, 972 (5th Cir. 1976). Of course, in order to promote these policies, it is necessary that the buyer inform the seller within a commercially reasonable time that the buyer regards the contract or warranty as broken.

■ Applying these principles to the present case, I find that the notice from EMS to Snow Lion of the first two breaches discovered—the over-calendarization problem and the failure of the goods to loft properly—complies with the dictates of Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(3)(a). First, notice of these defects was given within a commercially reasonable time. UCB offered no evidence to refute that EMS gave notice of the non-conforming aspects of the Chevron Vests shortly after their arrival. Having done this, EMS did not act unreasonably in waiting until sometime in May, 1977, when Messrs. Bragg and Stilling came to EMS headquarters in Boston, to inform Snow Lion of similar problems with the Northern Light Parkas, which had been delivered a month or so before the May visit. In addition, having arranged a meeting to be held on June 7 and 8, 1977 at which these breaches could be discussed, EMS did not act unreasonably in waiting until that meeting to notify Snow Lion of defects in the Super Down

Jackets, the last of the three shipments to be delivered. The record suggests that the course of dealing between Snow Lion and EMS was to arrange face-to-face meetings to discuss business problems. Moreover, the selling season did not begin until August, and as EMS did not plan to reject the goods, giving notice in May and June left ample time for the parties to attempt to work out a solution to the problems created by the shipments of defective merchandise. That EMS acted in commercial good faith is further attested by the fact that, immediately upon receiving, on June 7 or 8, 1977, the test results showing that the vests and jackets did not conform to the contract specifications for filling power, EMS made these results available to Snow Lion. Tests had not yet been performed on the Northern Light Parkas, because upon arrival they had not appeared as low in loft as the other garments and EMS personnel thought that, given time, they might recover.

The record does not reveal the precise content of the notifications of defects given before the June 7 and 8, 1977 meeting. It does show, however, that whatever notice was given served the purposes of Mass.Gen. Laws Ann. ch. 106 [UCC], .§ 2–607(3)(a). *See Matsushita Electric Corp. of America v. Sonus Corp.,* 362 Mass. 246, 261–62, 284 N.E.2d 880, 889 (1972). By informing Snow Lion that its shipments of merchandise were defective and by arranging a meeting on June 7 and 8, 1977 to discuss the problem, EMS opened the way for compromise and settlement between the parties. Indeed, the parties approached the problem as business associates attempting to reach satisfactory resolution of the dilemma, keeping in touch with each other during the course of the summer and meeting again in November.[1] Thus, EMS's communications and conduct both before and at the June 7 and

---

1. Although credits against the invoice prices of the defective goods were granted EMS at the June and November, 1977 meetings, during both meetings EMS reiterated that its bottom-line position was that the company had to maintain the original gross dollar profit margin it would have received on the goods as warranted. *See* part IV, *supra.* Thus, although EMS was willing to meet with Snow Lion to attempt to iron out a solution to the problem created by the non-conforming character of the goods, the implication was clear that EMS con-

8, 1977 meeting promoted good faith relations between EMS and Snow Lion. The advancement of good faith in commercial dealings is best served by following a course of action designed to elicit reasonable discussion aimed at working out a mutually acceptable solution between the parties.

■ Remaining to be considered is the issue whether the notice given by EMS to Snow Lion of the last discovered defect in the three sets of goods—the failure of the garments to conform to FTC guidelines for goods labeled as "down"—meets the requirements of Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(3)(a). The statute requires the notice of any breach to be given within a reasonable time after the buyer *discovers or should have discovered* the breach. Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(3)(a) (emphasis added). When Snow Lion representatives visited EMS headquarters in early to mid-January, 1978, shortly after the results of the tests conducted by the Attorney General's Office of the State of Maine were disclosed to EMS, EMS informed Snow Lion that the goods violated federal requirements for down content. Under the notice principles stated above, this notice was timely and adequate unless EMS did discover or should have discovered before January, 1978 that the Snow Lion garments violated the FTC guidelines.

UCB argues, although not in connection with the notice issue, that EMS knew at least by the time of the November, 1977 meeting that the goods did not conform to the FTC regulations for down content. In support of this contention, UCB offered evidence that the down content and filling power of a garment are directly related, so that one knowledgeable in the trade or industry who observed problems with the filling power of a garment would have reason to know that the down content of the item was also defective. Moreover, it is not disputed that one familiar with the content of

the FTC guidelines would have known, by looking at information contained on the reports of the tests performed on the goods in June and August of 1977, that the articles did not conform to the FTC guidelines. Finally, UCB contends that EMS knew by November of 1977 that Snow Lion had been indicted in California for selling illegal down, and that this knowledge put EMS on notice that goods purchased by Snow Lion violated federal criteria for products labeled as "down."

■ I find, however, that EMS did not know until around January 11, 1978, when the results of the tests conducted by the Attorney's General's Office of the State of Maine were disclosed to EMS, that the three sets of garments in question failed to conform to FTC guidelines for down products. Even though EMS had available to it information from which one fully informed of the content of the FTC guidelines would conclude that the goods contained illegal down, the evidence does not establish that anyone at EMS was familiar with the content of the FTC guidelines. In fact, Mr. Canby and Mr. McDonough both testified that they were unaware of the content of the FTC requirements until January of 1978. Their testimony is supported by the fact that EMS never made reference to the FTC guidelines for down content in its advertising materials or in its mail order catalog. Rather, EMS's advertising on down products focused exclusively on the issue of loft, promoting the idea that the filling power of a garment is a measure of its ability to keep the wearer warm and thus of its overall quality. In addition, there is every reason to believe that, had EMS known that the goods contained illegal down, EMS would have bargained for far larger credits than it received, particularly for the Northern Light Parkas, at the November, 1977 meeting.

UCB cannot prevail on its claim that EMS should have discovered and notified

sidered the contracts as broken and would take legal action if its expectation regarding gross profits was not met.

Snow Lion before January of 1978 that the goods violated the FTC guidelines for down content. Having been indicted in California for selling illegal down, Snow Lion knew at the time of the November, 1977 meeting that the down products sold to EMS failed to meet the relevant federal criteria. Yet, in response to questions from Mr. McDonough of EMS about the legality of the down content of the goods, Snow Lion failed to inform EMS of this breach and failed to disclose to EMS the true severity of the legal proceedings pending in California. EMS will not be barred from asserting its claim on the ground that it failed to give timely notice of a breach that Snow Lion already knew about and in bad faith failed to disclose to EMS. To hold that the requirement of timely notice bars EMS's claim in these circumstances would be to convert § 2–607(3)(a) into a trap to be used against an unwary buyer of products known by a wrongdoing seller to be more seriously defective than the buyer suspected. Such a result would undermine the policies of promoting compromise and good faith in commercial relations that underlie Mass.Gen.Laws ch. 106 [UCC], § 2–607(3)(a). *See Barrett Roofing & Supply Co. v. Ross,* 131 F.Supp. 348, 352–53 (D.Mass.1955) (under the notice provision of the former Sales Act, Mass.Gen.Laws Ann. ch. 106, § 38, held that where seller knew that goods were defective and would never be acceptable to buyer if true facts were known, seller could not insist on stricter standard requiring notice reasonably soon after buyer should have discovered the breach by inspecting for easily ascertainable defects).

In light of the foregoing findings, I conclude that the notice from EMS to Snow Lion that the three shipments of down merchandise failed to conform to guidelines for goods labeled as "down" fulfilled the requirements of Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(3)(a).

### C. Accord and Satisfaction/Waiver of Breach of Warranty Claims

UCB contends that EMS is barred from asserting its claims for offsets or damages caused by the defects in the down goods because, at the November, 1977 meeting with Snow Lion, EMS entered into an accord and satisfaction of, or by its conduct waived, any claims or defenses arising out of the sale of those goods. The burden of proving an accord and satisfaction between EMS and Snow Lion rests upon UCB. *See Rust Engineering Co. v. Lawrence Pumps, Inc.,* 401 F.Supp. 328, 333 (D.Mass.1975).

■ I find that no such accord and satisfaction—or any other modification of contractual relation by which EMS released Snow Lion from the claims here asserted for damages or offsets arising from the sale of the defective down products—was reached by EMS and Snow Lion at the November, 1977 meeting.[2] It is undisputed that, at this meeting, Snow Lion responded to EMS's claims of defects by agreeing to grant certain credits off the invoice prices of the three shipments of down garments. It does not follow, however, that by accepting these credits, EMS entered into "an agreement under the terms of which the dispute [was] compromised." *Id.* The evidence establishes that EMS neither intended nor engaged in conduct from which one could reasonably infer that it intended to enter into a "final settlement" of the controversy over the defective merchandise. *Id.*

■ First, Mr. McDonough of EMS reiterated at the November meeting the position he had taken at the meeting of June 7 and 8, 1977: EMS expected to maintain the gross dollar profit margins it would have

---

2. Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–209 sets forth various requirements that an agreement modifying a contract must meet in order to be valid under the Uniform Commercial Code. Because I find that no agreement affecting EMS's claims or defenses in this action was entered into between EMS and Snow Lion, I need not decide whether an agreement of the kind alleged by UCB would meet the criteria stated in § 2–209.

realized on the goods had they been delivered as warranted. In other words, EMS refused to relinquish its claim for lost profits on the sale of the down goods, notwithstanding any credits granted by Snow Lion. That EMS clung to this position at the November, 1977 meeting is clearly inconsistent with the notion that EMS entered into a release or accord and satisfaction of all claims or defenses related to the defects then known to EMS. Second, at the time of the November meeting, EMS was not aware that the goods failed to conform to FTC guidelines for products labeled as "down." For these reasons, I find that EMS did not enter into a binding accord and satisfaction or release of claims for offsets or damages flowing from that breach. *See J. F. White Contracting Co. v. New England Tank Industry of New Hampshire,* 393 F.2d 449, 450–51 (1st Cir. 1968). Moreover, had EMS and Snow Lion reached an accord and satisfaction at the November, 1977 meeting, the agreement might well be unenforceable by reason of Snow Lion's failure to disclose to EMS at that meeting the severity of the pending legal proceedings in California. The law would not permit UCB, as assignee, to claim the benefit of its assignor's accord and satisfaction with EMS and at the same time disregard defects in the making of that accord and satisfaction that would preclude its assignor from enforcing it against EMS.

Under Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–209(4), an "attempt at modification", although failing to satisfy the criteria for modifications set forth in § 2–209(2) and (3), may nevertheless operate as a waiver. However, in light of the findings stated above, I conclude that EMS did not by its conduct at the November, 1977 meeting "waive" the claims asserted in this action for lost profits and consequential damages flowing from the sale of the nonconforming down goods.

## VII.

*Breach of Warranty or Contract Claims Arising Out of Sale of Waban Parkas*

■ EMS proved at trial that the Waban Parkas contained at least the following de-

fects: (1) the nylon exteriors were over-calendarized; and (2) the Polarguard bats with which the parkas were filled were not uniform. It may well be that each of these defects constituted a breach of express warranty, particularly in view of evidence that EMS often ordered Snow Lion products after viewing samples of the goods. *See* Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–313(1)(c). I need not decide, however, whether any express warranty for the Waban Parkas was violated, because I conclude that the implied warranty of merchantability for the garments was violated by reason of these defects. *See* Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–314(2)(a), (c), and (d). In addition, the evidence supports EMS's claim that the contract for the parkas was broken by reason of late delivery. Thus, although EMS accepted the Waban Parkas, EMS has met its burden of proving one or more breaches with respect to these goods. Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(4).

In view of the findings stated in part III–D, *supra,* I conclude also that EMS gave Snow Lion timely and adequate notice of the defects in the Waban Parkas. *See* Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(3)(a). The first notice that the goods were defective was given to Snow Lion within the same month that the parkas were delivered. In the circumstances of this case, a month's delay between discovery and notice of a breach cannot be characterized as unreasonable. There is no evidence of the precise content of the notice given in December of 1977. The record shows, though, that EMS and Snow Lion representatives discussed the problem created by the condition of the parkas at the January, 1978 meeting. Thus, whatever notice was given in December was sufficient to pave the way at least for initial efforts between the parties to settle the controversy. That Snow Lion entered into bankruptcy proceedings during January of 1978 may well have stifled any further negotiations regarding the Waban Parkas. This fact, however, cannot prejudice the rights of

EMS, which acted in commercial good faith with respect to informing Snow Lion of Waban Parka defects. *See* Uniform Commercial Code, 1962 Official Text with Comments, § 2–607 comment 4, *partially quoted in Nugent,* 353 Mass. at 48–49, 228 N.E.2d at 93–94; *see also T. J. Stevenson & Co.,* 629 F.2d at 360 & n. 46.

The question whether EMS gave Snow Lion adequate notice that the agreement for the sale of the Waban Parkas had been broken by reason of late delivery is more difficult to answer on the record before me. The agreement between the parties provided that the parkas were to be delivered on or before April 1, 1977, and the inference may therefore be drawn that EMS knew or should have known around that date that Snow Lion had failed to comply with the deadline for delivery. There is no evidence that at any time after April 1, 1977 EMS sent any oral or written communications urging delivery of the goods as soon as practicable.

On the other hand, the record shows that, during the summer and fall of 1977, EMS informed Snow Lion that the parkas had not yet been delivered. During this period, and again in December of 1977 and January of 1978, the parties discussed the subject of extended dating for the late garments. Deposition of William Simon, at 73–74; Deposition of Alan McDonough, at 66–67. Thus, Snow Lion was on notice that EMS considered the contract broken. As a result of notice given to Snow Lion by EMS, the parties attempted to make at least some progress toward settling the controversy over the late delivery. In addition, given that the selling season for the Waban Parkas did not begin until August of 1977, EMS did not act in a commercially unreasonable manner in waiting until the early summer of 1977 to inform Snow Lion that the goods had not arrived.

■ In view of these findings, I conclude that EMS gave Snow Lion sufficient notice of the breach of contract by reason of the late delivery. Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–607(3)(a).

## VIII.

### Breach of Agreement for Advertising Credits

Under the original agreement for advertising credits entered into in 1975 or 1976 between EMS and Snow Lion, EMS was to receive credits from Snow Lion only after fulfillment of the following two conditions: (1) that EMS supply to Snow Lion the documentation that Snow Lion would be required to submit to Celanese Corporation, the manufacturer; and (2) that Snow Lion first receive payment from Celanese Corporation for the credits submitted on behalf of EMS.

■ On the findings stated in part IV, *supra,* however, I conclude that at the June 7 and 8, 1977 meeting EMS and Snow Lion entered into a new or substituted agreement. Under the new agreement, EMS promised to abandon its claims for credits for advertising services previously rendered in exchange for Snow Lion's promise to issue EMS a credit in the amount of $25,000. An explicit term of the new agreement was that neither of the two conditions attached to the original agreement would have to be fulfilled. Thus, the new agreement was in the nature of an accord and satisfaction or discharge of existing rights and duties under the original 1975 or 1976 agreement. *See generally* 6 Corbin, Contracts § 1293, at 189 (2d ed. 1962).

■ As EMS's claim for advertising credits from Snow Lion was made in the good faith belief that the claim was well founded, the substituted June agreement was supported by sufficient consideration and thus was valid. *Blair v. Cifrino,* 355 Mass. 706, 708, 247 N.E.2d 373, 375 (1969). *See also Zlotnick v. McNamara,* 301 Mass. 224, 225–26, 16 N.E.2d 632, 633 (1938). Plaintiff does not dispute that Snow Lion never issued the agreed upon $25,000 credit

to EMS. I therefore conclude that EMS has proved a breach of the substituted agreement of June 7 and 8, 1977.

The evidence does not show that EMS and Snow Lion ever entered into a new or substituted agreement with respect to credits claimed by EMS for advertising services performed after June 7 and 8, 1977. Therefore, the rights and obligations of the parties are governed by the original 1975 or 1976 agreement; under which EMS would be entitled to credits for advertising after June, 1977 only if both of the conditions stated above had been met. There is no evidence that Celanese Corporation ever paid Snow Lion the $12,340.13 amount claimed as a credit by EMS. Nor is there any evidence that Snow Lion failed to use due diligence to obtain any credit for which EMS furnished Snow Lion with documentation. Having failed to establish fulfillment of one of the conditions of the agreement, EMS has not proved a valid claim for breach of contract regarding post-June, 1977 advertising credits.

## IX.

### *Validity of EMS's Claims as Offsets Against UCB's Claim*

Having concluded in parts VI–VIII, *supra,* that EMS has proved its respective claims for breach of warranty or contract regarding the defective down goods and Waban Parkas and its claim for breach of contract as to the $25,000 advertising credit, I must now consider whether these various claims may be asserted as offsets against the claim of UCB.

■ Mass.Gen.Laws Ann. ch. 106 [UCC], § 9–318(1) governs the rights of an account debtor against an assignee.[3] Section 9–318(1) accommodates the competing interests of the assignee and the account debtor by separating claims and defenses of the latter against the former into two categories. The first category includes claims and defenses arising out of the terms of the contract from which the assigned account was created. Regardless of when they accrue, these claims and defenses may be asserted by the account debtor as offsets against the amount owed the assignee on the contract or assigned account. Mass. Gen.Laws Ann. ch. 106 [UCC], § 9–318(1)(a). *See Fall River Trust Co. v. B. G. Browdy,* 346 Mass. 614, 616, 195 N.E.2d 63, 64 (1964); 2 Gilmore, Security Interests in Personal Property § 41.4, at 1090–91 (1965). As the official comment to § 9–318(1) states,

> ... When the account debtor's defenses on an assigned account, chattel paper or a contract right arise from the contract between him and the assignor it makes no difference whether the breach giving rise to the defense occurs before or after the account debtor is notified of the assignment (subsection (1)(a)).

Uniform Commercial Code, 1962 Official Text with Comments, § 9–318(1) comment 1.

■ Claims or defenses of the second type contemplated by § 9–318(1) are those that do not arise from the contract of sale that was the subject of assignment. An account debtor may assert these claims and defenses as offsets against the amount owed the assignee on the contract or assigned account only if the claims or defenses accrued before the account debtor received notice of the assignment. Mass.Gen. Laws Ann. ch. 106 [UCC], § 9–318(1)(b). *See Fall River Trust Co.,* 346 Mass. at 616, 195 N.E.2d at 64; 2 Gilmore, Security Inter-

3. Mass.Gen.Laws Ann. ch. 106 § 9–318(1) reads as follows:

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9–206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

ests in Personal Property § 41.4, at 1090–91 (1965). The official comment to § 9–318(1) states this proposition as follows:

> ... The account debtor may also have claims against the assignor which arise independently of that contract: an assignee is subject to all such claims which accrue before, and free of all those which accrue after, the account debtor is notified (subsection (1)(b)).

Uniform Commercial Code, 1962 Official Text with Comments, § 9–318(1) comment 1.

 The three sets of defective down goods that are the subject of EMS's breach of warranty claims were all delivered before June 15, 1977, the date on which EMS received notice of the assignment to UCB. Under Massachusetts law, "it is clear that a cause of action for breach of a sales contract, express or implied, accrues when delivery is made, regardless of the buyer's knowledge of the breach." *Wolverine Insurance Co. v. Tower Iron Works,* 370 F.2d 700, 702 (1st Cir. 1966). *See also* Mass.Gen. Laws Ann. ch. 106, [UCC] § 2–725(2). I therefore conclude that each of the claims asserted by EMS for breach of warranty or contract regarding the down goods accrued before notice of the assignment.

 Because these claims accrued before EMS received notice of the assignment, I conclude that, under Mass.Gen. Laws Ann. ch. 106 [UCC], § 9–318(1)(b), the claims may be asserted as offsets against UCB's claim. Section 9–318(1)(b) applies specifically to claims or defenses that are not related to the contract or contracts from which the assigned account or accounts receivable were created. Therefore, even if each invoice is assumed to be a separate contract,[4] EMS nevertheless is entitled under § 9–318(1)(b) to offset dam-

ages flowing from breaches of the contracts for the down goods against amounts owed to UCB on other assigned accounts or contracts.

The Waban Parkas were delivered sometime in December of 1977. Under the standard set forth in *Wolverine Insurance Co.,* 370 F.2d at 702, EMS's claims of breach of warranty based on defects in these goods did not accrue until December, 1977, after EMS received notice of assignment.[5] UCB does not dispute, though, that EMS's claims with respect to the Waban Parkas arose from the terms of the contract for the sale of these goods. Nor does UCB dispute that the invoice memorializing this sale was never paid by EMS and is one of the assigned accounts receivable on which UCB now sues. The amount of offsetting damages claimed by EMS is less than the $54,945 amount claimed by UCB on the invoice for the parkas. Thus, even if UCB is assumed to be correct in arguing that each invoice constitutes a separate contract, EMS is entitled under § 9–318(1)(a) to assert as offsets to the amount claimed by UCB on the contract for the sale of the parkas EMS's claims arising out of that same contract. *See Fall River Trust Co.,* 346 Mass. at 616, 195 N.E.2d at 64 ("If the ... missing goods were processed under the contracts which gave rise to the assigned accounts, it would make no difference when the plaintiff gave [defendant] notice of the assignment. The rights of the assignee would be subject to any defence or claim arising between the terms of the bailment contract between the assignor and the account debtor regardless of notice").

 There is another independent ground for holding that EMS may offset against UCB's claim EMS's claims with respect to the down goods and its claims

---

4. *But see* pp. 964–965 *infra.*

5. Because the parkas were to be delivered in April of 1977, EMS's claim of breach of contract by virtue of late delivery may have accrued before the date that EMS received notice of assignment. In light of the conclusion

reached below, however, I need not decide whether this claim accrued before receipt of notice of assignment and could therefore be asserted against UCB under Mass.Gen.Laws Ann. ch. 106 [UCC], § 9–318(1)(b).

regarding the Waban Parkas. The evidence in this case does not support UCB's argument that each of the 189 invoices on which UCB sues should be viewed as a separate contract. Rather, the findings stated in part II of this opinion, *supra,* indicate that the course of dealing between EMS and Snow Lion was to treat the entire EMS-Snow Lion account as a single contract or "running account." *See generally* 4 Corbin, Contracts § 953, at 827–29 (2d ed. 1962). The evidence shows, moreover, that UCB was aware of the course of dealing between EMS and Snow Lion, *see* Exhibit 4, and that the relevant figure for UCB's purposes was the total amount outstanding on the EMS-Snow Lion account. UCB sent EMS a single notice of assignment of the entire EMS-Snow Lion account rather than mailing individual notices of assignment of each invoice. In addition, UCB did not verify amounts due on each individual invoice. In these circumstances, I conclude that the entire EMS-Snow Lion account was a single contract and that, therefore, under Mass.Gen.Laws Ann. ch. 106 [UCC], § 9–318(1)(a), EMS is entitled to offset claims arising out of sales memorialized by particular invoices—including invoices that have already been paid—against amounts claimed by UCB on other outstanding invoices. *See Haverhill Manor, Inc. v. Commissioner of Public Welfare,* 368 Mass. 15, 22–23, 330 N.E.2d 180, 186–87, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975) and cases cited therein. Thus, EMS may offset its claims regarding the down goods and Waban Parkas against UCB's claim even if UCB's claim is based on unrelated transactions.

The question whether EMS may offset against UCB's claim damages arising from Snow Lion's breach of the June, 1977 agreement for advertising credits is not so easily answered. The key to answering the question lies in whether the claim or defense regarding the $25,000 advertising credit "accrued" before notice of assignment. There is no Massachusetts decision construing the term "accrued" in this context.

The word "accrue," used in a legal sense, most often appears in statutes of limitations, where it is used to determine the commencement of the running of one statute. *See, e.g.,* Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–725(2); Mass.Gen.Laws Ann. ch. 260, § 2. In that context, Massachusetts law provides that a cause of action based on breach of contract "accrues" at the time of the breach. *See* Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–725(2); *Newburgh v. Florsheim Shoe Co.,* 200 F.Supp. 599, 604 (D.Mass.1961) and cases cited therein.

If this interpretation of the term "accrue" were to be adopted in the context of § 9–318(1)(b), it would be open to serious question whether EMS's claim for breach of the June 7 and 8, 1977 contract accrued before notice of assignment was received by EMS on June 15, 1977. The agreement between EMS and Snow Lion did not include an explicit term for time of performance of Snow Lion's promise to issue the $25,000 credit. If such a term were to be implied either in fact or in law, a reasonable time for performance might well extend longer than the seven or eight day period between the date the agreement was reached and the date of receipt of notice of assignment. If the time for performance were construed to be after June 15, 1977, the contract would not have been broken and therefore EMS's claim would not have "accrued" in time to fit within the definition of § 9–318(1)(b).

Applying this interpretation of the term "accrued" to § 9–318(1)(b) in the circumstances of this case would defeat the purposes of the statutory provision. Section § 9–318(1)(b) is intended to strike an accommodation between the conflicting interests of the account debtor and the assignee. The account debtor is entitled to protection from being unduly prejudiced by the assignment. On the other hand, this protection cannot extend so far as to expose the assignee to "potential liability for [the] assignors' breach," thus undermining the value of the assignment as a security device.

*See Michelin Tires (Canada) Ltd. v. First National Bank of Boston,* 666 F.2d 673, 678 (1st Cir. 1981). The drafters of the Uniform Commercial Code resolved this conflict by selecting the date of receipt of notice of assignment as a cut-off point for the assignee's liability to the account debtor for claims and defenses unrelated to the assigned contracts or accounts; before entering into a security agreement with the assignor and informing the account debtor of the assignment, the assignee may investigate and discover all such claims or defenses to which the assignor is subject. In choosing this manner of accommodating the competing interests at stake, the drafters "[made] no substantial change in prior law. An assignee has traditionally been subject to defenses or setoffs *existing* before an account debtor is notified of the assignment." Uniform Commercial Code, 1962 Official Text with Comments, § 9–318(1) comment 1 (emphasis added).

In the present case, Snow Lion incurred a liability for the $25,000 advertising credit on the very day that it entered into the agreement with EMS. EMS had no obligations to perform under the contract, which was in the nature of an accord and satisfaction or compromise of EMS's previous claims for advertising credits. In a very real sense, then, EMS's claim to the credit came into existence on June 7 or 8, 1977, at the time that Snow Lion agreed to issue it. At that time, UCB had neither perfected its security interest nor sent EMS a notice of the assignment. By undertaking reasonable investigation, UCB would have been able to discover the existence of Snow Lion's obligation to pay the $25,000 credit. That obligation was not, after June 7 or 8, 1977, a mere "potential liability." *Michelin Tires (Canada) Ltd.,* 666 F.2d at 678.

For these reasons, I am led to the conclusion that EMS's claim for the $25,000 advertising credit accrued on June 7 and 8, 1977, before EMS received notice of the assignment, and may therefore be asserted under § 9–318(1)(b) as a setoff against UCB's claim.

X.

*Damages Allowable as Offsets to UCB's Claim*

Having proved that its claims for breach of warranty or contract regarding the down goods and Waban Parkas and its claim for breach of the June, 1977 agreement for advertising credits are valid and may be asserted against UCB, EMS contends that these claims support the following three elements of damages as offsets to UCB's claim: (1) lost profits resulting from the breaches of warranty or contract for the down goods and Waban Parkas; (2) costs of conducting the recall campaign and issuing refunds to customers, which were incurred as a consequence of the failure of the down goods to conform to the FTC guidelines; and (3) the $25,000 amount agreed to as an advertising credit but never issued by Snow Lion. Each of these three elements of damages is considered in turn below.

A.

Lost Profits

EMS contends that, as a result of the breaches of contract or warranty for the down goods and Waban Parkas, it sustained a loss of profits and that, under Mass.Gen. Laws Ann. ch. 106 [UCC], §§ 2–714 and 2–715, its lost profits may be offset against UCB's claim.

Under Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–714(1), a buyer who has accepted goods and given the seller adequate notice of a breach "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." The buyer may also, under § 2–714(3), in a proper case recover "any incidental or consequential damages" under § 2–715. As defined in § 2–715(2), consequential damages include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty.

Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–715(2)(a), (b).

These statutory provisions have been construed in Massachusetts to allow recovery of lost profits resulting from breach of warranty or contract. In *Matsushita Electric Corp. of America v. Sonus Corp.*, 362 Mass. 246, 263–65, 284 N.E.2d 880, 889–890 (1972), the Supreme Judicial Court of Massachusetts upheld a trial court's award of damages based on prospective profits the defendant lost as a result of the plaintiff's several breaches of express warranty or contract. The defendant's actual sales during the relevant period had fallen short of its anticipated sales, determined on the basis of the defendant's past earnings record and the expert testimony of defendant's president regarding projected sales. The trial judge had held that the resulting loss of profits was caused by plaintiff's breaches, although not attributing a specific amount of damages to any particular breach. In affirming the trial court's award of damages for lost profits, the Supreme Judicial Court relied on all three of the provisions cited above, Mass.Gen.Laws Ann. ch. 106 [UCC], §§ 2–714(1), 2–714(3), and 2–715(2)(a), (b). The court cited also § 1–106(1), concluding that the defendant's right to "be put in as good a position as if the other party had fully performed" entitled it to recover for the loss of prospective profits resulting from plaintiff's breaches. *Matsushita Electric Corp. of America*, 362 Mass. at 264, 284 N.E.2d at 890.

As in *Matsushita,* the evidence in this case shows that the defendant suffered a loss of profits as a result of Snow Lion's breaches of warranty or contract. I find that, as a result of the breaches of warran-ty or contract for the down goods and Waban Parkas, EMS did not realize the level of profits that it would have realized had the goods been delivered as warranted. Even before January of 1978, when EMS discovered that the down goods purchased from Snow Lion failed to conform to the FTC guidelines, the defective garments sold at prices below their original retail prices. Subsequently, after EMS entered into the Assurance of Discontinuance with the Attorney General's Office of the State of Maine, EMS was forced to sell the down products at substantially reduced prices as "seconds" in its bargain basement store. Because of their defective condition, the Waban Parkas also sold at prices well below their original retail prices. In addition, due to late delivery in November or December of 1977, the parkas missed a large part of the selling season, which had begun in August.

EMS introduced specific proof of the amount of profits lost by reason of the breaches of warranty or contract for the goods. First, EMS presented evidence from which its anticipated gross sales on the goods as warranted can be calculated with reasonable accuracy. Mr. Paul Gorman, who had been employed in various managerial capacities at EMS for several years at the time of the events in question, testified as to the original retail prices at which the goods would have been sold during the relevant period if delivered as warranted. Tr. III–15; *see* Exhibit 37. As the original retail prices quoted by Mr. Gorman roughly correspond to a one hundred per cent markup on the original invoice prices of the garments, his testimony substantially comports with the testimony of other EMS managerial witnesses who stated that in the ordinary course of business goods marked with the EMS private label were sold at prices derived by adding a one hundred per cent markup to the original invoice prices of the goods. *E.g.,* Deposition of Caleb Canby, at 85–89. By multiplying the number of garments in each shipment by the original retail price at which the garments would

have been sold if free of defects, a projected gross sales figure for the goods can be derived. *See* Exhibit 37; Appendix. Drawing their conclusions from EMS's past sales history, Mr. Gorman and other EMS witnesses testified that EMS's past sales history indicated that in the usual course of business, EMS was not able to sell all private label items at their original retail prices and that, after normal mark-downs on the garments, EMS usually recovered approximately ninety-four to ninety-five per cent of the projected gross sales figure calculated on the basis of the original selling prices of the goods. Tr. III–123–124; Deposition of Caleb Canby, at 88–90. Thus, by multiplying this projected gross sales figure by ninety-four per cent, a reasonable estimate of the amount of gross sales that EMS would have realized from the sale of the goods had there been no breaches of warranty or contract can be derived. These calculations, set forth in the Appendix to this opinion, yield $723,548.55 as the total amount of gross sales anticipated by EMS on the down goods and Waban Parkas.

EMS also established with reasonable accuracy the amount of gross sales it actually received from the sale of the goods in their defective condition. Mr. Gorman testified to the amount of actual gross sales for the Chevron Vests, Northern Light Parkas, Super Down Jackets, and Waban Parkas. Tr. III–114. He explained that these amounts were calculated by means of an electronic device operated by EMS to record the sales prices at which particular goods are sold and to keep track of inventories on hand, and that the records of the electronic device were corroborated by means of physical inventories undertaken by EMS. Tr. III–105–122. Adding the amounts of actual gross sales on each of the down garments and Waban Parkas yields a sum of $490,-223.25 as a reasonable estimate of the total amount of actual gross sales realized by EMS on the sale of the goods. *See* Appendix.

EMS contends that the amount of profits it lost as a result of the breaches may be calculated by, first, subtracting from the total amount of gross sales it anticipated the total amount of gross sales it actually realized from the sale of the down goods and Waban Parkas and, second, deducting from the resulting figure the total amount of credits issued by Snow Lion on the invoice prices of the goods. Another way of computing the amount of gross profits lost by EMS is to (1) subtract from the total amount of anticipated gross sales the sum of the original invoice prices of the goods to derive the amount of gross profits anticipated by EMS from the sale of the goods; (2) subtract from the total amount of actual gross sales realized the sum of the original invoice prices of the goods less the total amount of credits issued by Snow Lion to arrive at an actual gross profits figure; and (3) deduct the final figure in (2) from the final figure in (1) to derive a reasonable approximation of the amount of gross profits lost by EMS by reason of the breaches of contract or warranty. As demonstrated in the Appendix to this opinion, however, the process proposed by EMS yields the same result as the three-step process proposed above. Both mathematical processes yield a gross lost profits figure of $151,295.90.

There is little evidence bearing directly on the question whether EMS incurred the same costs in selling the goods in their defective condition as it would have incurred in selling them as warranted. The record does show, though, that at least until EMS received the results of the investigation by the Attorney General's Office of the State of Maine, EMS continued to market the goods in the usual manner.[6] In light of this evidence and the evidence bearing on the general nature of the EMS enterprise, it is reasonable to infer that EMS's expenditures in selling the goods were not reduced by reason of the defects in the goods. Crediting this inference, I find the amount of net profits lost by EMS to be the same as

6. *But see* part X–B, *infra,* at 970–971.

the amount of gross profits lost as a result of the breaches. I therefore find that the $151,295.90 figure calculated by one of the two methods described above is the amount of profits lost by EMS by reason of the breaches of warranty or contract for the down goods and Waban Parkas. Given that EMS proved that each of its claims for breach of warranty or contract is valid and may be asserted against UCB, I need not determine the specific amounts of damages attributable to various breaches respectively.

As in the *Matsushita* case, then, the defendant in this case has proved that it sustained a loss of profits as a result of breaches of warranty or contract and has established with reasonable definiteness and accuracy the amount of lost profits attributable to the breaches. *See* Uniform Commercial Code, 1962 Official Text with Comments, § 1–106(1) comment 1, partially quoted in *Matsushita Electric Corp. of America,* 262 Mass. at 264, 284 N.E.2d at 890 ("The third purpose of [§ 1–106(1)] is to reject any doctrine that damages must be calculable with mathematical accuracy. Compensatory damages are often at best approximate: they have to be proved with whatever definiteness and accuracy the facts permit, but no more"). *See also* Uniform Commercial Code, 1962 Official Text with Comments, § 2–715(2)(a) comment 4.

There is only one potentially significant respect in which the facts of this case may be distinguished from those presented in *Matsushita.* In that case, all of the breaches from which the loss of profits resulted were breaches of contract or express warranty, whereas, in this case, at least some of the breaches causing the loss of profits are breaches of implied warranty. The distinction is potentially relevant because damages flowing from a breach of express warranty may fit more readily within the category of "loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know," Mass.Gen.Laws Ann. ch. 106 [UCC],

§ 2–715(2)(a). In this case, however, I find that the loss of profits sustained by EMS as a result of Snow Lion's breaches, whether characterized as breaches of express or of implied warranty, is a loss resulting from requirements or needs of EMS of which Snow Lion had reason to know at the time of contracting with EMS. EMS may therefore recover its lost profits as consequential damages under § 2–715(2)(a).

The official comment to the Uniform Commercial Code provides some guidance in interpreting the standard for consequential damages set forth in Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–715(2)(a). Comment 2 states that § 2–715(2)(a) "adopts the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' ·in advance," although modifying the liberality of that rule by allowing recovery only where the buyer could not reasonably have prevented the loss by cover or otherwise. Uniform Commercial Code, 1962 Official Text with Comments, § 2–715(2)(a) comment 3. The comment to the Massachusetts code makes clear that § 2–715(2)(a) is in accord with cases in Massachusetts following the common law standard of foreseeability of the loss as a measure of whether consequential damages may be recovered. *See* Mass.Gen. Laws Ann. ch. 106 [UCC], Massachusetts Code Comment, § 2–715(2)(a) comment b, *quoting from Royal Paper Box Co. v. Munro & Church Co.,* 284 Mass. 446, 453, 188 N.E. 223, 225 (1933) ("Payment of damages to the plaintiff's customers because of the unfitness of the material was a foreseeable and probable result of a breach of the defendant's warranty"). *See also Hawkins v. Jamrog,* 277 Mass. 540, 543–44, 179 N.E. 224, 225 (1931).

In this case, there is no doubt that Snow Lion knew that EMS was a retail seller who would offer for resale to the public the goods purchased from Snow Lion. Snow Lion therefore had reason to know that defects of the kind proved at trial, rendering the goods of less than first quality,

would reduce the value of the goods in the market and thereby result in a loss of profits by EMS. In other words, that a loss of profits would result from the defects—each of which involved a breach of a term of the contract that EMS required to be fulfilled in order to sell the goods contracted for at fair market value—was a foreseeable result of those breaches.

It cannot be open to serious question that Snow Lion knew that if the Waban Parkas were not delivered at least by the time the selling season began in August of 1977, EMS would suffer a loss of profits from the sale of those garments. Nor can it seriously be doubted that Snow Lion, as a winter clothing manufacturer which had done business with EMS for a substantial period of time, had reason to know that EMS would have difficulty selling at a fair price goods that were not filled with uniform insulation. Snow Lion also knew that EMS had focused in its advertising on the issue of loft and therefore had reason to know that if EMS's contractual specifications for filling power or lofting capacity were not met, EMS might fail to realize its anticipated profits from the sale of the down goods. In addition, Snow Lion knew or should have known of the FTC guidelines regulating the down content of products it manufactured and knew or should have known that EMS required for resale to its customers goods that comported with applicable federal law. To excuse Snow Lion on the ground that it lacked this knowledge would defeat the public policy expressed in the FTC regulations, as manufacturers such as Snow Lion are in a far better position than retailers to ensure that goods labeled as "down" fulfill legal requirements for products bearing those labels. That a loss of profits might well result from a breach by reason of failing to ensure the legality of the down content of the goods was a foreseeable result of the breach.

EMS, moreover, could not have prevented its loss of profits through cover or otherwise. By the time the goods were delivered to EMS, it was too late to secure similar goods from another manufacturer by the time the selling season began. In addition, the evidence shows that EMS took reasonable steps to reduce its losses. EMS initially bought commercial dryers in which to dry the goods in an attempt to render them marketable; it made efforts throughout to sell the goods at a fair market price; and finally, after the action by the Attorney General's Office of the State of Maine, EMS resorted to selling the defective down garments as "seconds" in its bargain basement store. Thus, EMS acted reasonably to mitigate damages.

██ In light of the foregoing, I conclude that, under Mass.Gen.Laws Ann. ch. 106 [UCC], §§ 2–714(1), 2–714(3), and 2–715(2)(a), EMS may offset against UCB's claim $151,295.90, the amount of profits EMS lost as a result of Snow Lion's several breaches of warranty or contract for the down goods and Waban Parkas. EMS is entitled to be put in the same position it would have been in had these goods been delivered as warranted.

### B.

### Costs of Conducting Recall Campaign and Issuing Refunds

EMS asserts that, as a result of the failure of the down goods to conform to FTC guidelines for products labeled as "down," it was forced to conduct a campaign for recalling the goods and to issue refunds to customers who wanted to return the defective garments. EMS argues that, under Mass.Gen.Laws Ann. ch. 106 [UCC], §§ 2–714 and 2–715, the costs incurred in taking these actions may be offset against UCB's claim.

I find that EMS would not have incurred these costs but for Snow Lion's breach of warranty or contract by reason of failure to ensure that the down goods comported with the applicable FTC regulations. Had the down goods conformed to the federal guide-

lines, EMS would not have been investigated by the Attorney General's Office of the State of Maine and would not have entered into the Assurance of Discontinuance with that office under which EMS agreed to conduct a recall campaign and to issue refunds to dissatisfied customers. Of course, had the Attorney General's Office not investigated EMS, EMS might have discovered through some other means that the goods failed to meet federal requirements and might have undertaken either of its own initiative or because of prompting by some other party to recall the garments and make refunds or settlements with customers. Even were that the case, however, the costs of recalling and issuing refunds on the items nevertheless would be attributable to Snow Lion's breach, since the expenses would not have been incurred absent that breach.

One way of analyzing whether the recall expenses and refunds may be recovered by EMS is to view these costs as part of EMS's claim for loss of profits sustained as a result of Snow Lion's breach. That is, as the amount of profits realized by EMS from the sale of the down goods was reduced directly by the amount of funds expended by EMS in conducting the recall campaign and making refunds to customers, the claim for recovery of the recall expenses and refunds might be seen as one element of EMS's overall claim for profits lost as a result of the defective down content of the goods.

Whether viewed as an aspect of EMS's claim for lost profits or as a separate claim for consequential damages, EMS's costs in conducting the campaign for recall of the defective goods and in making refunds to dissatisfied customers may be offset against the claim of UCB. I concluded in subpart A, *supra,* that Snow Lion had reason to know at the time of contracting that EMS, as a retail seller of down garments, required goods for resale to its customers that conformed to the standards for down content and labeling provided by federal law. I found also that Snow Lion, being aware

that EMS was a retail seller, had reason to know that EMS would suffer a loss of profits as a result of a breach of warranty by Snow Lion by reason of failing to ensure that the goods contained the down content warranted on the label. I now conclude that, as Snow Lion knew that the garments sold to EMS were to be resold to consumers, Snow Lion had reason to know that EMS would have to guarantee to its customers that the goods were as warranted on the labels and that if the goods failed to comply with their warranties for down content, EMS would have to recall the items and make refunds or settlements with customers to whom the defective goods were sold.

To state the matter another way, an ordinarily prudent manufacturer standing in Snow Lion's shoes at the time of contracting would have known that EMS required down products that it would resell to its customers to conform to applicable federal law regarding down content and labeling, and that if this need were not met, EMS would be responsible and would have to take action to remedy the harm to purchasers of the goods. An ordinarily prudent manufacturer standing in Snow Lion's shoes might not have foreseen that a state Attorney General's Office would take action against EMS as a result of the manufacturer's failure to produce goods that were as warranted on the label, but that is of no consequence, because this hypothetical manufacturer would have realized that, whether prompted by state officials or some other party or undertaken by EMS of its own accord, EMS would be required to remedy the harm to consumers by conducting a recall and making refunds or settlements on the illegally-labeled garments. That the Attorney General's action, or the *means* or *mechanism* by which the loss occurred in this case, was not foreseeable does not affect the foreseeability of recall and refund costs, or the *type* of loss that was incurred, as a probable result of the breach. In these circumstances, I conclude that the recall and refund expenses incurred by EMS fall within the scope of Mass.Gen.Laws Ann. ch.

106 [UCC], § 2–715(2)(a). *See Royal Paper Box Co. v. Munro & Church Co.,* 284 Mass. 446, 453, 188 N.E. 223, 225 (1933); *Boyce v. Fowler,* 87 F.Supp. 796, 799–800 (D.Mass. 1949). Compare the standard applicable in tort actions, *e.g., Hill v. Winsor,* 118 Mass. 251, 259 (1875) ("[I]t is not necessary that injury in the precise form in which it in fact resulted should have been foreseen. It is enough that it now appears to have been a natural and probable consequence").

EMS has proved with sufficient accuracy the amount of refunds issued to customers for the defective Snow Lion down garments. As found in part V, *supra,* of this opinion, those refunds total $12,340.13. In addition, EMS has introduced evidence from which the costs of the defective Snow Lion products can be calculated with reasonable accuracy. As set forth in part V, *supra,* the total cost to EMS of conducting the recall campaign was $29,551.32. Of the six items included in the recall, only four were manufactured by Snow Lion. EMS was not able to segregate from the total cost of conducting the recall the specific amounts expended on recalling the four Snow Lion garments. A reasonable method of computing EMS's costs in conducting the recall of the four defective Snow Lion garments, then, on the evidence available in this case, is to assume that the costs of recalling each item were equal and to take two-thirds of the $29,551.32 amount expended on the entire recall campaign—or $19,700.88—as the amount of recall costs attributable to Snow Lion's breaches of warranty for the goods. *See* Uniform Commercial Code, 1962 Official Text with Comments, § 1–106(1) comment 1, § 2–715(2)(a) comment 4.

EMS's recall and refund expenses could not reasonably have been prevented by cover or otherwise. I therefore conclude that, under Mass.Gen.Laws Ann. ch. 106 [UCC], §§ 2–714(1), 2–714(3), and 2–715(2)(a), EMS is entitled to offset against UCB's claim recall and refund costs in the amount of $19,700.88.

## C.

### Advertising Credit

It seems almost tautological to state that, as a direct result of Snow Lion's breach of the June, 1977 agreement to issue EMS an advertising credit in the amount of $25,000, EMS incurred a loss in the amount of $25,000. Nevertheless, judges are sometimes called upon to state the obvious. EMS has a right to be put in the same position as if Snow Lion had fully performed its obligation under the contract. *See* Mass.Gen. Laws Ann. ch. 106 [UCC], § 1–106(1). I therefore conclude that, under Mass.Gen. Laws Ann. ch. 106 [UCC], § 2–714(1), EMS is entitled to offset against UCB's claim compensatory damages in the amount of $25,000.

## XI.

### Interest

As stated in part I, *supra,* the parties stipulated that the amount EMS owes UCB on the unpaid invoices from the Snow Lion account is $265,979.77. UCB claims 18% per annum interest on this amount on the ground that, although EMS purchase orders made no reference to interest, each invoice rendered by Snow Lion contained an express provision that any unpaid balance remaining after the due date was "subject to a 1½% per month finance charge which results in an effective rate of 18%" interest annually. *E.g.,* Exhibits F, G. The monthly statements issued by Snow Lion also included this provision. *E.g.,* Exhibits C, H, K. Tr. II–86; Exhibit 7.

Mr. McDonough testified at trial, however, that, during 1976 and 1977, Snow Lion never exacted from EMS any finance charges on accounts past due. Tr. II–85–87. Mr. Canby testified by deposition that Snow Lion never sought to obtain and EMS never paid interest on outstanding accounts. Deposition of Caleb Canby, at 45–46. Snow Lion's practice of billing, as reflected in the monthly statements issued to EMS, corrobo-

rates the testimony of these two EMS employees. The May 31, 1977 statement issued by Snow Lion to EMS contains no finance charges on amounts past due. As UCB sent EMS a copy of this monthly statement along with the notice of assignment, UCB was on notice that Snow Lion did not apply to EMS the finance charge provision contained in its invoices and monthly statements. Exhibit C. The December 31, 1977 statement also includes no finance charges on accounts for which payment was overdue. Exhibit H. That the May, 1978 statement contains small finance charges on three particular invoices for shipments to EMS retail outlets in Lob Pine, Tonawanda, and Denver, and no finance charges on the many other invoices for which payment was overdue, provides further support for the inference that Snow Lion did not consider the provision for 18% annual finance charges a term of its agreement with EMS.

■ On the evidence in this case, then, I find that, before and after EMS received notice of assignment to UCB, Snow Lion followed a practice to which EMS manifested its consent of not applying to EMS the finance charge provision contained in Snow Lion's printed forms. In these circumstances, I conclude that, even if Mass.Gen.Laws ch. 106 [UCC], § 2–207 would operate to make the finance charge provision a part of the written contract between Snow Lion and EMS, that written agreement would not be enforceable in this case. First, EMS and Snow Lion entered into a modification of the written contract, under which the two agreed that the finance charge provision was not to be applied to EMS. Under Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–209(1), the agreement modifying the contract needed no consideration to be binding and is therefore valid.[7] Second, even were the oral modification invalid, Snow Lion's

conduct in failing to enforce the finance charge provision against EMS nevertheless would constitute a waiver of the provision. Mass. Gen. Laws Ann. ch. 106 [UCC], § 2–209(4).

■ As Snow Lion's assignee, UCB is bound by the agreement and conduct of its assignor, particularly where as here UCB was on notice before notifying EMS of the assignment that Snow Lion did not apply the finance charge provision to EMS. I therefore conclude that UCB is barred from recovering 18% per annum interest on its claim against EMS.

The briefs of the parties have not addressed the calculation of interest under the applicable Massachusetts statute. Unless the parties file joint or separate submissions seeking a different method of calculation, interest will be allowed at the statutory rate of eight per cent per annum, commencing from the date of filing of the complaint, on the net sum due UCB after deducting the offsets allowed in this opinion. *See* Mass.Gen.Laws Ann. ch. 231, § 6C.

Counsel for UCB and EMS are directed to confer to determine whether they can reach agreement on the amount of the judgment to be entered in conformity with this opinion. If counsel are not able to agree, then each party shall submit to the court, on or before April 12, 1982, its proposal for the judgment to be entered, including (1) any challenges to calculations contained in this opinion and the Appendix; and (2) its proposals for the appropriate calculation of interest to be allowed and an explanation of why that amount is proper under Mass.Gen.Laws ch. 231, § 6C.

### Appendix

#### A. *Method Proposed by Defendant for Calculating Lost Profits*

*Step 1.* Calculate projected gross sales by multiplying the number of goods in each

---

7. As UCB failed to plead or otherwise raise the statute of frauds as a defense, *see* Mass.Gen. Laws Ann. ch. 106 [UCC], § 2–201, I need not and do not consider whether the oral agreement is invalid by reason of failing to comply with Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–209(3).

shipment by the original retail price at which the goods would have been sold as warranted.

Projected Gross Sales

| Number of Goods to Be Sold | Original Retail Price | Amount |
|---|---|---|
| 8,000 Adult Chevron Vests | $29.50 | $236,000.00 |
| 2.000 Child's Chevron Vests | 19.50 | 39,000.00 |
| 1,021 Northern Light Ripstop Parkas | 99.50 | 101,589.50 |
| 982 Northern Light Super [Taffeta] Parkas | 99.50 | 97,709.00 |
| 3,022 Super Down Jackets | 59.50 | 179,809.00 |
| 1,850 Waban Parkas | 62.50 | 115,625.00 |
| | TOTAL | $769,732.50 |

*Step 2.* Multiply the total projected gross sales amount derived in Step 1 by .94 to obtain the amount of gross sales EMS would have realized on the sale of the goods after normal mark-downs.

$769,732.50 \times .94 = $723,548.55

*Step 3.* Add together the amounts of actual gross sales for each good to obtain the total amount of actual gross sales realized by EMS on the sale of the goods.

| Actual Gross Sales | Amount * |
|---|---|
| 8,000 Adult Chevron Vests | $119,640.88 |
| 2.000 Child's Chevron Vests | 31,438.29 |
| 1,021 Northern Light Ripstop Parkas | 48,772.61 |
| 982 Northern Light Super [Taffeta] Parkas | 74,603.15 |
| 3,022 Super Down Jackets | 124,097.32 |
| 1,850 Waban Parkas | 91,671.00 |
| TOTAL | $490,223.25 |

*Step 4.* Subtract the figure derived in Step 3 from the figure derived in Step 2.

$723,548.55
−490,223.25
$233,325.30

*Step 5.* Total the amounts of credits issued by Snow Lion to be applied against the invoice prices of the goods.

$25,000.00
3,024.00
54,005.40
TOTAL $82,029.40

*Step 6.* Subtract the figure derived in Step 5 from the figure derived in Step 4 to

* An examination of the figures contained on Exhibits 36 and 37 reveals a few errors in computation and in transposing the relevant

obtain the amount of profits lost by EMS as a result of the breaches.

$233,325.30
82,029.40
TOTAL $151,295.90

**B.** *Alternative Method for Calculating Lost Profits*

*Step 1.* Add together the amounts of the original invoice prices for each of the goods.

| Number of Goods in Each Shipment | Original Invoice Price | Amount |
|---|---|---|
| 8,000 Adult Chevron Vests | $13.70 | $109,600.00 |
| 2.000 Child's Chevron Vests | 10.70 | 21,000.00 |
| 1,021 Northern Light Ripstop Parkas | 48.50 | 49,518.50 |
| 982 Northern Light Super [Taffeta] Parkas | 51.50 | 50,573.00 |
| 3,022 Super Down Jackets | 31.00 | 93,682.00 |
| 1,850 Waban Parkas | 29.70 | 54,945.00 |
| | TOTAL | $379,318.50 |

*Step 2.* To obtain the amount of gross profits anticipated from the sale of the goods, subtract the total amount derived in Step 1 from the amount of gross sales EMS would have realized on the sale of the goods after normal mark-downs (calculated in Step 2 in A above).

$723,548.55
−379,318.50
TOTAL $344,230.05

*Step 3.* Subtract the total amount of credits issued by Snow Lion to be applied against the invoice prices of the goods (calculated in Step 5 in A above) from the figure derived in Step 1.

$379,318.50
− 82,029.40
TOTAL $297,289.10

*Step 4.* To obtain the amount of actual gross profits realized from the sale of the goods, subtract the figure derived in Step 3 from the total amount of actual gross sales realized by EMS on the sale of the goods (calculated in Step 3 in A above).

$490,223.25
−297,289.10
TOTAL $192,934.15

figures from Exhibit 36 to Exhibit 37. These errors have been corrected in this Appendix.

*Step 5.* Subtract the figure derived in Step 4 from the figure derived in Step 2 to obtain the amount of profits lost by EMS as a result of the breaches.

$344,230.05
−192,934.15
TOTAL $151,295.90

### C. Calculation of Judgment Before Interest

| Amount Owed UCB on Unpaid Invoices from EMS-Snow Lion Account | | $265,979.77 |
|---|---|---|
| Allowable Offsets | | |
| Lost Profits | $151,295.90 | |
| Refunds to Customers | 12,340.12 | |
| Allocated Costs of Recall Campaign | 19,700.88 | |
| Advertising Credit | 25,000.00 | |
| | Total Offsets | $208,336.90 |
| | Balance | $ 57,642.87 |

### JUDGMENT

In accordance with and for the reasons stated in the Memorandum of this Court issued this date, it is ordered:

Judgment is hereby entered for the Plaintiff, United California Bank, in the amount of Sixty-seven Thousand, Four Hundred Sixty-eight Dollars and Ninety-six Cents ($67,468.96).

### Supplemental Opinion

In my opinion of March 31, 1982, I directed counsel to confer to determine whether they could reach agreement on the amount of judgment to be entered in conformity with the opinion. I ordered that, in the event counsel were not able to agree, each party submit a proposal for the judgment to be entered, including (1) any challenges to calculations contained in the opinion and the Appendix; and (2) a proposal for the calculation of interest to be allowed and an explanation of the appropriateness of the proposed amount under the controlling statute, Mass.Gen.Laws Ann. ch. 231, § 6C.

Counsel were unable to agree on the amount of interest and thus the amount of judgment to be entered. UCB and EMS filed separate proposals for the method of calculating and amount of interest to be awarded; neither party challenged the *calculations* set forth in the opinion and Appendix of March 31, 1982.[1]

In an attempt to avoid further needless expenditure of resources by counsel and the court on the interest question, I set a conference for May 14, 1982 and placed before the parties a draft calculation of interest that incorporated parts of each party's proposal that appeared consistent with Mass. Gen.Laws Ann. ch. 231, § 6C. The parties rejected the draft and subsequently filed further submissions on the matter. Having considered the submissions of the parties, I am directing the clerk to enter judgment, including pre-judgment interest, in accordance with this memorandum. Findings of fact and conclusions of law are set forth below.

### I.

### Amount of Interest Owed UCB

The parties agree that the question of pre-judgment interest is governed by Mass. Gen.Laws Ann. ch. 231, § 6C, which, at the time this action was instituted, provided as follows:[2]

In all actions based on contractual obligation, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the

---

1. In response to the court's invitation to submit challenges to the calculations set forth in the March 31, 1982 opinion and Appendix, counsel for UCB challenged only findings underlying the award of damages to EMS. *See* Proposal of Plaintiff United California Bank for Judgment to be Entered, Part I, filed April 16, 1982. Thus, counsel for UCB did not challenge the mathematical calculations set forth in the opinion and Appendix.

2. The parties agree that the 1980 amendment to Mass.Gen.Laws Ann. ch. 231, § 6C, 1980 Mass.Acts, ch. 322, § 2, increasing the interest rate from 8 per cent to 10 per cent per annum, is not applicable to this action. Section 3 of 1980 Mass.Acts, ch. 322 provides that the increased rate is to apply only to causes of action commenced on and after the effective date of the act.

court to the amount of damages, at the contract rate, if established, or at the rate of eight per cent per annum, from the date of breach or demand. If the date of the breach or demand is not established, interest shall be added by the clerk of the court, at such contractual rate, or at the rate of eight per cent per annum from the date of the commencement of the action.

*See* 1974 Mass. Acts ch. 224, § 2.

In its second submission, UCB argues that (1) even accepting the finding in the March 31, 1982 opinion that the EMS-Snow Lion account constituted a single contract or running account, each invoice nevertheless specified a date on which payment was due from EMS for the goods sold pursuant to that invoice; and (2) the payment due date specified in each individual invoice is the date of EMS's breach under Mass.Gen. Laws Ann. ch. 231, § 6C, and, accordingly, the total amount of pre-judgment interest to be awarded UCB should be derived by computing the amount of interest owed on each individual invoice, beginning from the payment due date set forth in that invoice, and adding each such amount together.

The evidence regarding the payment terms between EMS and Snow Lion is not entirely clear. At least one date does appear on the face of each invoice—usually in the block labeled "date" in the upper right hand corner of the invoice. Occasionally, a date appears in a block labeled "via" to the left of the "date" block. Most of the invoices, moreover, specify "terms" such as "Net 90," "Net 60," "Net 30," or "COD." *See*

invoices in Exhibit E. In addition, a document entitled "Snow Lion Information Sheet" states that the billing period "starts as of date in the right hand corner of invoice"; that "in most cases, this is the date of shipment"—the exception being that "with early shipments of preseason orders, billing period starts with date required, not date of shipment"; and that "[b]illing period never starts from the date of arrival of merchandise in store. Billing is FOB Berkeley." Exhibit 31.

■ This evidence, apart from the evidence of oral modification discussed immediately below, supports UCB's position that payment was due from EMS on each individual invoice as specified in the invoice, *e.g.,* 30 days from the date of shipment where the terms stated on the invoice were "Net 30." However, at trial, Mr. McDonough testified that EMS's "terms with Snow Lion were 90 days." Tr. II–86, 92. I credit this testimony, as Mr. McDonough was a credible witness and his testimony is consistent with other testimony that indicated that the course of dealing between Snow Lion and EMS often involved a relaxation of formalities in an attempt at mutual accommodation.[3] By a preponderance of the evidence, then, I find that the terms between Snow Lion and EMS were that payment was due on each invoice 90 days from the date of shipment of the goods sold, as evidenced by the date listed or by the earlier of the two dates listed on the particular invoice.[4] In light of these findings, I need not decide whether Mass.Gen.Laws ch. 106 [UCC] § 2–207 would operate to make

**3.** Mr. McDonough's testimony might appear, on its face, to be somewhat inconsistent with his testimony that Snow Lion never sought to extract finance charges from EMS, as one might wonder why Snow Lion would require 90-day terms—or any payment terms at all—if it did not intend to impose finance charges on amounts past due. There are, however, reasons why a seller would seek to impose payment terms other than the reason that doing so would allow the seller to extract finance charges if the buyer did not pay on time. Indeed, the matter now before me illustrates the point dramatically. In addition, since Mr.

McDonough testified for EMS that EMS and Snow Lion had agreed to 90-day terms, EMS cannot prevail on an argument that, because Snow Lion never imposed interest for late payment, the payment due date and thus the date of breach has not been sufficiently established for the purpose of calculating interest.

**4.** Where two dates appear on an invoice, the inference I draw is that the earlier date contained in the "via" block is the date of shipment.

the terms stated in each invoice a part of the written contract between Snow Lion and EMS because I conclude that any such written contract is superseded here by a valid oral modification entered into by Snow Lion and EMS under which the two agreed on 90-day terms for each sale.[5]

■ This finding is not inconsistent with my previous finding that—for the purpose of concluding that EMS would be entitled, under Mass.Gen.Laws Ann. ch. 106 [UCC], § 9–318(1)(a), to offset claims arising out of sales evidenced by particular invoices against amounts claimed by UCB on other outstanding invoices—the EMS-Snow Lion account was a "running account" or single contract. The evidence shows that EMS, like other customers, was directed to specify, when it had received a credit memo, the invoice to which EMS wanted the credit applied. If Snow Lion issued credits on a particular transaction after EMS had already paid the invoice reflecting that transaction, Snow Lion would allow EMS to apply the credits against unpaid invoices relating to other transactions. This evidence is sufficient to justify the conclusion that EMS should be allowed to offset against UCB's claim EMS's claims for breach of warranty, even if those claims were based on unrelated transactions, as that result is consistent with the course of dealing between Snow Lion and EMS. The evidence also reveals, though, that Snow Lion directed EMS to specify, when making a payment, the particular invoice to which EMS wanted the payment applied. In addition, separate invoice numbers and corresponding dates were listed on the monthly statements rendered by Snow Lion. This evidence supports the conclusion that the agreement between EMS and Snow Lion that payment

was due on each sale 90 days after the date of shipment of the goods sold was unaffected by Snow Lion's rendering of monthly statements recapitulating individual sales and other transactions. Generally, the effect of a running account is not to alter the dates upon which the individual bills become due, but rather to bar subsequent suit on individual bills that were due at the time the original action on the account was brought. *See generally* 4 Corbin, Contracts § 953, at 827–29 (2d ed. 1962).

■ On the basis of the finding that Snow Lion and EMS agreed that payment was due on each invoice 90 days from the date of shipment of the goods sold pursuant to that invoice, I conclude that, under Mass. Gen.Laws Ann. ch. 231, § 6C, the date—or, in this case, the dates—of breach of EMS's contractual obligations to UCB have been established. I conclude that the dates of breach are the dates 90 days from the dates of shipment listed on the individual invoices on which UCB is entitled to recover, and therefore UCB may recover 8 per cent annual interest on the balances due on those invoices beginning from those dates of breach.[6] I draw this conclusion with some hesitation, as there is no Massachusetts decision directly mandating it and I fear the result to be achieved is rarely worth the effort required to calculate the interest on each individual transaction from each separate due date. Nevertheless, I reach this conclusion in an abundance of caution, attempting to be entirely faithful to the language of Mass.Gen.Laws Ann. ch. 231, § 6C.

In accordance with this conclusion, I have computed the amount of pre-judgment interest owed UCB by the following method. Using the table set out as Exhibit A to the Memorandum of Plaintiff UCB in Response

---

5. Under Mass.Gen.Laws Ann. ch. 106 [UCC], 2–209(1), the oral notification needed no consideration to be binding. Further, as UCB failed to plead or otherwise raise the statute of frauds as a defense, *see* Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–201, I need not consider whether the oral agreement would be invalid

by reason of failing to comply with Mass.Gen. Laws Ann. ch. 106 [UCC], § 2–209(3).

6. *But see* pp. 950–952, *infra* (discussing date of breach of EMS's obligation to pay for the Waban Parkas and Northern Light Parkas).

to the Draft Calculation of Interest on Judgment, I have: (1) changed the payment terms to 90 days for all of the invoices listed and recalculated the payment due dates accordingly; (2) recalculated the interest periods (expressed in terms of years) on all of the invoices from the appropriate payment due dates until today's date, the date of final judgment; and (3) multiplied the balances due on the invoices, as specified in Exhibit A,[7] by the appropriate corresponding interest periods by .08, the fraction expressing the statutory rate of interest to be applied. *See* Appendix A.

A few alterations from this general scheme must be noted. First, I find that the date of breach of EMS's obligation to pay for the Waban Parkas has not been established, and, accordingly, UCB will be awarded interest on the amount owed on those goods beginning from May 18, 1978, the date of commencement of this lawsuit. UCB claims interest on EMS's obligation to pay for the Waban Parkas beginning 45 days from October 27, 1977, the date listed on Invoice # 48728. The Waban Parkas, however, were shipped late and were not received by EMS in Boston until sometime in November or December of 1977. Moreover, during the fall and summer of 1977, and again in December of 1977 and January of 1978, the parties discussed extended dating for the late garments. *See* March 31, 1982 opinion, at pp. 8, 26. In these circumstances, I find that the date on which payment for the parkas became due from EMS has not been established.

Similarly, I find that the date of breach with respect to payment for the Northern Light Parkas has not been established. Although the inference may be drawn that the date of shipment (March 29, 1977) listed in Invoice # 39344 is correct, since the parkas were delivered on or about April 6, 1977, the evidence shows that at the June,

1977 meeting and again at the November, 1977 meeting Snow Lion granted extended dating on these garments. *See, e.g.,* Tr. II–62, 70, 92. In light of this evidence, I find that the date on which payment was due from EMS on the Northern Light Parkas is unclear, and I therefore conclude that UCB is entitled to interest on the amount due for the parkas dating from March 18, 1978, the date of commencement of this action.

Finally, there is the matter of credits granted EMS, as memorialized by credit memos rendered by Snow Lion to EMS. Conceding that interest is due EMS on these credits, UCB contends that the total amount of this interest should be derived by calculating the amount of interest owed EMS on each individual credit memo, beginning from the date on which the memo was issued, and adding each such sum together. I conclude that, in general, this is an acceptable method of computing interest due EMS for credits granted. Most of the relevant credit memos do not appear to evidence credits granted on sales of goods for which UCB claims payment in this action, and thus EMS apparently had already paid for the goods with respect to which these credits were granted. As the evidence does not indicate the payment due dates for the goods to which these credits relate, it is fair and appropriate to award EMS interest on these credits beginning from the dates on which the corresponding credit memos were issued.

There are exceptions to this general rule, however. Two of the credits at issue relate to invoices upon which UCB sues here. The third credit listed in Exhibit B to the Memorandum of Plaintiff UCB in Response to the Draft Calculation of Interest on Judgment—# 36880, which is for some undisclosed reason an invoice instead of a credit

---

7. Some of the balances specified in Exhibit A are different from the balances appearing on the actual invoices. *See* Exhibit E. As UCB and EMS entered into a stipulation that $265,-979.77 is the amount owed UCB (before offsets allowed EMS), and as the balances listed in Exhibit A less the credits enumerated by UCB in Exhibit B equal $265,979.77, I have inferred that the balances specified in Exhibit A are the proper amounts due UCB on the invoices.

memo—obviously related to the invoice of the same number listed by UCB as number 57 in Exhibit A. The invoice referred to in Exhibit A and the credit referred to in Exhibit B involve the same amount— $1,156.82. As it would be inappropriate to calculate interest on the invoice and on the credit from different dates, I have assumed that the invoice and credit were issued on the same day and have, accordingly, granted neither party interest on the $1,156.82 amount. This action has the same effect as awarding both parties interest on the $1,156.82 amount from the same day.

I have accorded similar treatment to the fourteenth credit listed in Exhibit B, which is a $42.30 credit on the sale memorialized by invoice # 43115, listed as number 183 in Exhibit A of plaintiff's memorandum. Rather than granting interest on the $42.30 credit and on the $668.10 balance due on the invoice from different dates, I have subtracted the $42.30 from the $668.10 and awarded interest on the balance—$625.80— from the date on which payment was due from EMS.

Calculations of the interest due UCB on the invoices are set forth in Appendix A, and calculations of the interest owed EMS on credits granted are set forth in Appendix B. The two credits referred to immediately above have been omitted from Appendix B, and Appendix A reflects the treatment, described above, of these two credits and the invoices to which they relate. The total amount of interest owed UCB, before deducting interest due EMS on the credits set forth in Appendix B, is $103,000.36. *See* Appendix A. Subtracting from that sum the amount of interest due EMS on the credits set forth in Appendix B—$7,172.85 —yields $95,827.51 as the total amount of pre-judgment interest to be awarded UCB.

## II.

### *Amount of Interest Owed EMS*

In order to determine the total amount of pre-judgment interest owed EMS, it is useful to calculate the amount of interest owed EMS on three sets of damages allowed EMS as offsets against UCB's claim: (1) damages flowing from the breaches of the warranties for the down goods; (2) damages resulting from the breaches with respect to the Waban Parkas; and (3) damages caused by the breach of the June, 1977 agreement for a $25,000 advertising credit.

### A.

### Down Goods

Under Mass.Gen.Laws Ann. ch. 231, § 6C, EMS is entitled to interest on damages resulting from the breaches of the warranties for the Chevron Vests, Northern Light Parkas, and Super Down Jackets beginning from the dates of the breaches of the warranties for these goods. The relevant inquiry, then, is when the breaches of the warranties for these goods occurred. Mass. Gen.Laws Ann. ch. 231, § 6C does not furnish a rule or method for ascertaining when a breach of warranty or contract has occurred, nor do the decisions construing that statute provide any guidance that is relevant to the circumstances of this case. The statute of limitations governing suits for breach of a sales contract, though, provides that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach" and that "[a] breach of warranty occurs when tender of delivery is made." Mass. Gen.Laws Ann. ch. 106 [UCC], § 2–725(2). *See also Wolverine Insurance Co. v. Tower Iron Works,* 370 F.2d 700, 702 and cases cited therein (1st Cir. 1966). In the absence of authority directly controlling the determination of the date of breach under Mass. Gen.Laws ch. 231, § 6C, I conclude that the rule stated in Mass.Gen.Laws Ann. ch. 106 [UCC], § 2–725(2)—that a breach occurs when tender of delivery is made—should be applied in the context of ascertaining the date of breach for the purpose of computing pre-judgment interest.

[28] Under this rule, the relevant issue in determining when the breaches of the warranties for the down goods occurred is ascertaining when the tenders of delivery for the goods were made. Although Mass. Gen.Laws Ann. § 106 [UCC], § 2–725 does not define "tender of delivery," other provisions in the Massachusetts code point to the conclusion that, where the agreement between the parties is a "shipment contract," requiring the seller to send the goods to the buyer but not to deliver them at a particular destination, delivery or tender of delivery occurs at the time and place of shipment of the goods. *See, e.g.,* Mass.Gen. Laws Ann. ch. 106 [UCC], §§ 2–503, 2–504, 2–319(1)(a); J. White & R. Summers, Uniform Commercial Code § 3–5, at 110 (". . . [i]n a shipment contract, delivery technically occurs at the point of shipment . . ."), § 3–6, at 113 ("[i]n § 2–504 'shipment contracts,' the time and place of delivery is at seller's city or place of business, and this is obviously not where the buyer is actually to receive and take possession of the goods"), § 6–4, at 184–85 (2d ed. 1980). I find, by a preponderance of the evidence in this case, that EMS and Snow Lion had an understanding that goods sold to EMS, including the down goods at issue here, were sold pursuant to shipment contracts, requiring Snow Lion to ship the goods from Berkeley but not to deliver them to EMS in Boston. *See, e.g.,* Exhibit 31. I therefore conclude that the dates of the breaches of the warranties for the down goods are the dates of shipment (or tender of delivery) of the goods.

I find that the date of shipment of the Chevron Vests is February 11, 1977, the earlier of the two dates appearing on Invoice # 37682, *see* Exhibit 8; that the date of shipment of the Northern Light Parkas is March 29, 1977, the date appearing in the upper right-hand corner of Invoice # 39344, *see* Exhibit 9; and that the date of shipment of the Super Down Jackets is April 7, 1977, the date appearing in the upper right-hand corner of Invoice # 39661, *see* Exhibit 11. I conclude that

these dates have been established with sufficient definiteness under Mass.Gen.Laws Ann. ch. 231, § 6C, and therefore EMS would be entitled to recover interest, commencing from these dates, on the damages attributable to the breaches occurring on these dates.

For two reasons, it would be difficult, if not impossible, to apportion accurately the damages attributable to the breaches of warranty for each particular set of down goods. First, as EMS was not able to segregate from the total cost of conducting the recall campaign and issuing refunds to customers the specific amounts spent on each set of down goods, the amounts of recall and refund expenses attributable to the breaches for each set of goods cannot be calculated (except by assuming that the expenses were equal for each set of goods and apportioning the costs accordingly). Second, the amounts of profits lost as a result of the breaches for each particular set of down goods could not be computed precisely because the $54,005.40 credit issued EMS, which was deducted in calculating the total amount of profits EMS lost on the sale of the down goods, *see* Appendix to March 31, 1982 opinion, cannot be divided, with any certainty, into credits granted on each individual sale.

EMS has proposed, for the sake of simplicity, that the court calculate interest on the total amount of profits lost on all three sets of down goods from April 18, 1977, the date on which the last set of the down goods was received by EMS in Boston. In the circumstances of this case, where apportionment of damages is difficult, I conclude that it is fair and appropriate to award interest on the total amount of profits lost on all three sets of goods from the latest of the three dates of breach. However, because I have concluded that the date of breach for a particular sale is determined by looking to the date of shipment by Snow Lion and not, as EMS apparently assumed, the date of receipt by EMS of the goods sold, I will award interest on the total

amount of profits lost by EMS from April 7, 1977, the latest date of shipment and thus of breach with respect to any of the down goods. Moreover, as the recall and refund expenses also resulted from breaches of the warranties for the down goods, I conclude that it is appropriate also to award interest from April 7, 1977 on the total amount of these expenses.

The total amount of profits lost on the sale of the three sets of down goods is $134,279.40, and the total amount of refund and recall costs is $32,041.00. Adding these two amounts together yields a sum of $166,-320.40 as the total amount of damages sustained by EMS by reason of the breaches of the warranties for the down goods. Eight per cent annual interest on this amount from April 7, 1977 is $70,137.08. These calculations are set forth in Appendix C.

## B.

### Waban Parkas

The date of shipment of the Waban Parkas listed on Invoice # 48728, pertaining to the parkas, is October 27, 1977. *See* Exhibit G. The evidence at trial established, however, that the parkas were received by EMS in Boston sometime in November or December of 1977. This evidence casts considerable doubt on whether the date of shipment listed in Invoice # 48728 is correct. I therefore conclude that, for the purpose of awarding interest on the profits lost on the sale of the Waban Parkas, the date of shipment or tender of delivery, and thus the date of breach, has not been established with sufficient definiteness to allow interest from that date. Accordingly, in conformity with Mass.Gen.

Laws Ann. ch. 231, § 6C, interest will be allowed from May 18, 1978, the date of commencement of this action.[8] This result is fair and reasonable, especially in light of the conclusion in part I, *supra,* that UCB may recover interest on the price of the parkas beginning from May 18, 1978.

The amount of profits lost by EMS on the sale of the Waban Parkas as a result of Snow Lion's breaches is $17,016.50. Interest on this amount from May 18, 1978, at the rate of 8 per cent per annum, is $5,661.60. These computations are set forth in Appendix C.

## C.

### Advertising Credit

The parties agree that, in conformity with the findings and conclusions reached in the March 31, 1982 opinion and Mass.Gen. Laws Ann. ch. 231, § 6C, EMS is entitled to interest from June 8, 1977, the date of breach, on the $25,000 amount of damages caused by Snow Lion's breach of its agreement to grant EMS an advertising credit in this amount. For this reason, EMS will be allowed to recover interest in the amount of $10,202.74, derived by computing 8 per cent annual interest on $25,000 from June 8, 1977. *See* Appendix C for calculations.

As set forth in Appendix C, the total amount of prejudgment interest to which EMS is entitled is $86,001.42.

## III.

### Calculation of Judgment, Including Pre-Judgment Interest

In accordance with the findings and conclusions reached in this memorandum and

---

8. UCB asserts that, where a date of breach in connection with any of EMS's claims for offsets has not been established, interest should be allowed from the date on which EMS filed its counterclaim and not from the date of the filing of the complaint in this action. This contention must be rejected. Mass.Gen.Laws Ann. ch. 231, § 6C provides simply that "[i]f the date of the breach or demand is not estab-lished, interest shall be added ... from the date of the commencement of the action." The most natural reading of the phrase "date of the commencement of the action" is to construe it to refer to the date of the filing of the complaint in the case. Neither precedent nor logic dictates a deviation from this construction where a defense or counterclaim is involved.

in the opinion of March 31, 1982, I conclude that UCB is entitled to pre-judgment interest in the amount of $95,827.51 on the $265,-979.77 amount owed to UCB on the unpaid invoices from the EMS-Snow Lion account. I conclude also that EMS may recover $86,-001.42 on the $208,336.90 [9] amount of offsets to which EMS is entitled.

The net amount of judgment for UCB, including pre-judgment interest, then, is as follows:

| | |
|---|---|
| Amount Owed UCB on Unpaid Invoices from EMS-Snow Lion Account | $265,979.77 |
| Pre-judgment Interest | 95,827.51 |
| | $361,807.28 |
| Total Amount of Offsets Allowed EMS | $208,336.90 |
| Pre-judgment Interest | 86,001.42 |
| | $294,338.32 |
| Amount of Judgment for UCB, Including Pre-judgment Interest | $67,468.96 |

Accordingly, judgment will be entered for UCB in the amount of $67,468.96.

## IV.

An underlying premise of the adversary system is that counsel for the parties, as zealous advocates for their respective clients and officers of the court, will address all issues the court must decide. Only then does advocacy fully illumine those issues. In relation to some issues in this case, and especially key issues relating to the appropriate method of calculating interest, the system has failed to function in conformity with this premise. I have found it necessary to examine issues not fully addressed by counsel.

To remove any doubt that might otherwise exist, I declare expressly that, even after entry of judgment in accordance with this memorandum, I remain willing to consider on the merits any new argument counsel may present in support of a timely post-judgment motion. This is, of course, not an invitation for a restatement of previous contentions that I have rejected. It is instead an assurance that any new contention, presented in a timely post-judgment motion, will be considered on the merits. If any contention is presented for the first time on appeal, it will be crystal clear that the failure to present it in the trial court was not due to unavailability of an opportunity to be heard.

### Appendix A

| Invoice Number | Invoice Date | Payment Due Date (90 days) | Outstanding Balance on Invoice | Interest Period (Years) | Total Interest Owed |
|---|---|---|---|---|---|
| 1. 14436 | 5/19/75 | 8/17/75 | $339.08 | 6.909589 | $187.43 |
| 2. 14494 | 5/21/75 | 8/19/75 | 84.80 | 6.9041095 | 46.84 |
| 3. 21803 | 11/19/75 | 2/17/76 | 27.00 | 6.4054794 | 13.84 |
| 4. 23469 | 1/19/76 | 4/19/76 | 40.13 | 6.279452 | 20.16 |
| 5. 23519 | 1/20/76 | 4/20/76 | 68.72 | 6.2767123 | 34.51 |
| 6. 24386 | 2/23/76 | 5/24/76 | 70.01 | 6.1424657 | 34.40 |
| 7. 24360 | 3/1/76 | 5/29/76 | 52.86 | 6.1287671 | 25.92 |
| 8. 24520 | 3/1/76 | 5/29/76 | 6.46 | 6.1287671 | 3.17 |
| 9. 26714 | 5/4/76 | 8/2/76 | 88.07 | 5.9506849 | 41.93 |
| 10. 27753 | 6/1/76 | 8/30/76 | 20.94 | 5.8739726 | 9.84 |
| 11. 27914 | 6/4/76 | 9/2/76 | 1.83 | 5.8657534 | .86 |
| 12. 33464 | 11/16/76 | 2/14/77 | 5.77 | 5.4136986 | 2.50 |
| 13. 34900 | 12/16/76 | 3/16/77 | 2.30 | 5.3315068 | .98 |
| 14. 35108 | 12/20/76 | 3/20/77 | 57.00 | 5.3205479 | 24.26 |
| 15. 36024 | 1/6/77 | 4/6/77 | 13.62 | 5.2739726 | 5.75 |
| 16. 36171 | 1/10/77 | 4/10/77 | 2.85 | 5.2630136 | 1.20 |

9. In reviewing the calculations set forth in the Appendix to the May 31, 1982 opinion, I have discovered that the total amount of offsets to which EMS is entitled is $208,336.90 and not $208,336.91, as stated in the previous opinion.

| | Invoice Number | Invoice Date | Payment Due Date (90 days) | Outstanding Balance on Invoice | Interest Period (Years) | Total Interest Owed |
|---|---|---|---|---|---|---|
| 17. | 36172 | 1/10/77 | 4/10/77 | 10.02 | 5.2630136 | 4.22 |
| 18. | 36332 | 1/12/77 | 4/12/77 | 17.21 | 5.2575342 | 7.24 |
| 19. | 36412 | 1/13/77 | 4/13/77 | 1.86 | 5.2547945 | .78 |
| 20. | 36413 | 1/13/77 | 4/13/77 | 1.86 | 5.2547945 | .78 |
| 21. | 36416 | 1/13/77 | 4/13/77 | 3.73 | 5.2547945 | 1.57 |
| 22. | 36417 | 1/13/77 | 4/13/77 | 6.53 | 5.2547945 | 2.75 |
| 23. | 36787 | 1/21/77 | 4/21/77 | 3.13 | 5.2328767 | 1.31 |
| 24. | 36788 | 1/21/77 | 4/21/77 | 8.41 | 5.2328767 | 3.52 |
| 25. | 36909 | 1/26/77 | 4/26/77 | 1.13 | 5.219178 | .47 |
| 26. | 36910 | 1/26/77 | 4/26/77 | 1.13 | 5.219178 | .47 |
| 27. | 36911 | 1/26/77 | 4/26/77 | 1.13 | 5.219178 | .47 |
| 28. | 36912 | 1/26/77 | 4/26/77 | 5.22 | 5.219178 | 2.18 |
| 29. | 36913 | 1/26/77 | 4/26/77 | 8.81 | 5.219178 | 3.68 |
| 30. | 37966 | 2/18/77 | 5/19/77 | 15.52 | 5.1561643 | 6.40 |
| 31. | 38225 | 2/25/77 | 5/26/77 | 15.06 | 5.1369863 | 6.19 |
| 32. | 37077 | 1/31/77 | 5/1/77 | 17.47 | 5.2054794 | 7.28 |
| 33. | 37078 | 1/31/77 | 5/1/77 | 14.59 | 5.2054794 | 6.08 |
| 34. | 37079 | 1/31/77 | 5/1/77 | 14.59 | 5.2054794 | 6.08 |
| 35. | 37080 | 1/31/77 | 5/1/77 | 23.31 | 5.2054794 | 9.71 |
| 36. | 37082 | 1/31/77 | 5/1/77 | 23.31 | 5.2054794 | 9.71 |
| 37. | 37084 | 1/31/77 | 5/1/77 | 11.65 | 5.2054794 | 4.85 |
| 38. | 37146 | 2/1/77 | 5/2/77 | 195.20 | 5.2027397 | 81.25 |
| 39. | 37197 | 2/2/77 | 5/3/77 | 45.94 | 5.2 | 19.11 |
| 40. | 37198 | 2/2/77 | 5/3/77 | 92.48 | 5.2 | 38.47 |
| 41. | 37199 | 2/2/77 | 5/3/77 | 24.75 | 5.2 | 10.30 |
| 42. | 37200 | 2/2/77 | 5/3/77 | 99.97 | 5.2 | 41.59 |
| 43. | 37201 | 2/2/77 | 5/3/77 | 220.36 | 5.2 | 91.67 |
| 44. | 37204 | 2/2/77 | 5/3/77 | 82.38 | 5.2 | 34.27 |
| 45. | 37205 | 2/2/77 | 5/3/77 | 57.72 | 5.2 | 24.01 |
| 46. | 37206 | 2/2/77 | 5/3/77 | 33.98 | 5.2 | 14.14 |
| 47. | 38289 | 2/28/77 | 5/29/77 | 45.57 | 5.1287671 | 18.70 |
| 48. | 38291 | 2/28/77 | 5/29/77 | 7.35 | 5.1287671 | 3.02 |
| 49. | 28343 | 2/28/77 | 5/29/77 | 12.12 | 5.1287671 | 4.97 |
| 50. | 38344 | 2/28/77 | 5/29/77 | 9.72 | 5.1287671 | 3.99 |
| 51. | 38453 | 3/3/77 | 6/1/77 | 9.90 | 5.1205479 | 4.06 |
| 52. | 38535 | 3/7/77 | 6/5/77 | 65.88 | 5.109589 | 26.93 |
| 53. | 38536 | 3/7/77 | 6/5/77 | 30.72 | 5.109589 | 12.56 |
| 54. | 38716 | 4/1/77 | 6/30/77 | 113.40 | 5.0410958 | 45.73 |
| 55. | 40748 | 4/30/77 | 7/29/77 | 1,986.30 | 4.9616438 | 788.42 |
| 56. | 41453 | 5/20/77 | 8/18/77 | 4,588.04 | 4.9068493 | 1,801.03 |
| 57. | 36880 | 1/28/77 | 4/28/77 | –0– | –0– | –0– |
| 58. | 39344 | ------- | 5/18/78 (date of commencement of action) | 46,086.10 | 4.1589041 | 15,330.43 |
| | (Northern Light Parkas) | | | | | |
| 59. | 44137 | 8/17/77 | 11/15/77 | 1,904.80 | 4.6630136 | 710.57 |
| 60. | 44451 | 8/25/77 | 11/23/77 | 5,679.00 | 4.6410958 | 2,108.54 |
| 61. | 44455 | 8/25/77 | 11/23/77 | 417.60 | 4.6410958 | 155.05 |
| 62. | 44458 | 8/25/77 | 11/23/77 | 810.00 | 4.6410958 | 300.74 |
| 63. | 44493 | 8/26/77 | 11/24/77 | 924.00 | 4.6328767 | 342.46 |
| 64. | 44496 | 8/26/77 | 11/24/77 | 2,882.40 | 4.6328767 | 1,068.30 |
| 65. | 44570 | 8/30/77 | 11/28/77 | 1,047.01 | 4.6273972 | 387.59 |
| 66. | 44684 | 9/2/77 | 12/1/77 | 182.05 | 4.619178 | 67.27 |
| 67. | 44721 | 9/6/77 | 12/5/77 | 799.12 | 4.6082191 | 294.60 |

| | Invoice Number | Invoice Date | Payment Due Date (90 days) | Outstanding Balance on Invoice | Interest Period (Years) | Total Interest Owed |
|---|---|---|---|---|---|---|
| 68. | 44741 | 9/7/77 | 12/6/77 | 102.25 | 4.6054794 | 37.67 |
| 69. | 44883 | 9/13/77 | 12/12/77 | 1,778.40 | 4.589041 | 652.89 |
| 70. | 44927 | 9/14/77 | 12/13/77 | 13.90 | 4.5863013 | 5.10 |
| 71. | 44962 | 9/15/77 | 12/14/77 | 908.45 | 4.5835616 | 333.11 |
| 72. | 44963 | 9/15/77 | 12/14/77 | 1,303.80 | 4.5835616 | 478.08 |
| 73. | 44965 | 9/15/77 | 12/14/77 | 440.79 | 4.5835616 | 161.63 |
| 74. | 45176 | 9/23/77 | 12/22/77 | 854.00 | 4.5616438 | 311.65 |
| 75. | 44448 | 10/1/77 | 12/30/77 | 1,272.00 | 4.539726 | 461.96 |
| 76. | 44450 | 10/7/77 | 1/4/78 | 760.50 | 4.5260273 | 275.36 |
| 77. | 44452 | 10/1/77 | 12/30/77 | 1,064.10 | 4.539726 | 386.46 |
| 78. | 44454 | 10/1/77 | 12/30/77 | 1,290.00 | 4.539726 | 468.50 |
| 79. | 44459 | 10/1/77 | 12/30/77 | 275.40 | 4.539726 | 100.02 |
| 80. | 44460 | 10/1/77 | 12/30/77 | 1,740.00 | 4.539726 | 631.93 |
| 81. | 44492 | 10/1/77 | 12/30/77 | 1,773.00 | 4.539726 | 643.91 |
| 82. | 44497 | 10/1/77 | 12/30/77 | 3,804.90 | 4.539726 | 1,381.86 |
| 83. | 44498 | 10/1/77 | 12/30/77 | 174.53 | 4.539726 | 63.39 |
| 84. | 44499 | 10/1/77 | 12/30/77 | 384.71 | 4.539726 | 139.72 |
| 85. | 45646 | 10/13/77 | 1/10/78 | 9.09 | 4.509589 | 3.28 |
| 86. | 45842 | 10/20/77 | 1/17/78 | 850.66 | 4.4904109 | 305.59 |
| 87. | 45843 | 10/20/77 | 1/17/78 | 1,613.70 | 4.4904109 | 579.69 |
| 88. | 45844 | 10/20/77 | 1/17/78 | 1,656.00 | 4.4904109 | 594.89 |
| 89. | 45845 | 10/20/77 | 1/17/78 | 425.33 | 4.4904109 | 152.79 |
| 90. | 45897 | 10/21/77 | 1/18/78 | 30.41 | 4.4876712 | 10.92 |
| 91. | 45898 | 10/21/77 | 1/18/78 | 370.36 | 4.4876712 | 132.96 |
| 92. | 45899 | 10/21/77 | 1/18/78 | 12.09 | 4.4876712 | 4.34 |
| 93. | 45952 | 10/24/77 | 1/21/78 | 828.00 | 4.479452 | 296.72 |
| 94. | 45953 | 10/24/77 | 1/21/78 | 85.77 | 4.479452 | 30.74 |
| 95. | 45954 | 10/24/77 | 1/21/78 | 340.30 | 4.479452 | 121.95 |
| 96. | 45955 | 10/24/77 | 1/21/78 | 828.00 | 4.479452 | 296.72 |
| 97. | 45956 | 10/24/77 | 1/21/78 | 649.61 | 4.479452 | 232.79 |
| 98. | 45958 | 10/24/77 | 1/21/78 | 170.27 | 4.479452 | 61.02 |
| 99. | 45959 | 10/24/77 | 1/21/78 | 662.40 | 4.479452 | 237.38 |
| 100. | 45961 | 10/24/77 | 1/21/78 | 2,484.00 | 4.479452 | 890.16 |
| 101. | 31582 | 10/6/76 | 1/3/77 | 4,680.00 | 5.5287671 | 2,069.97 |
| 102. | 31585 | 10/6/76 | 1/3/77 | 1,170.00 | 5.5287671 | 517.49 |
| 103. | 31636 | 10/7/76 | 1/4/77 | 1,170.00 | 5.5260273 | 517.24 |
| 104. | 31638 | 10/7/76 | 1/4/77 | 7,020.00 | 5.5260273 | 3,103.42 |
| 105. | 32863 | 11/2/76 | 1/31/77 | 2,835.00 | 5.4520547 | 1,236.53 |
| 106. | 32918 | 11/3/76 | 2/1/77 | 9,481.50 | 5.449315 | 4,133.41 |
| 107. | 33383 | 11/12/76 | 2/10/77 | 378.00 | 5.4164383 | 163.79 |
| 108. | 33384 | 11/12/76 | 2/10/77 | 7,087.50 | 5.4164383 | 3,071.12 |
| 109. | 33391 | 11/12/76 | 2/10/77 | 1,890.00 | 5.4164383 | 818.97 |
| 110. | 33393 | 11/12/76 | 2/10/77 | 315.00 | 5.4164383 | 136.49 |
| 111. | 46147 | 10/28/77 | 1/25/78 | 3,480.00 | 4.4684931 | 1,244.03 |
| 112. | 46148 | 10/28/77 | 1/25/78 | 2,249.10 | 4.4684931 | 804.00 |
| 113. | 46149 | 10/28/77 | 1/25/78 | 990.00 | 4.4684931 | 353.90 |
| 114. | 46150 | 10/28/77 | 1/25/78 | 696.00 | 4.4684931 | 248.81 |
| 115. | 46151 | 10/28/77 | 1/25/78 | 1,713.60 | 4.4684931 | 612.57 |
| 116. | 46152 | 10/28/77 | 1/25/78 | 495.00 | 4.4684931 | 176.95 |
| 117. | 46237 | 11/1/77 | 1/30/78 | 23.47 | 4.4547945 | 8.36 |
| 118. | 45625 | 11/10/77 | 2/8/78 | 5,132.70 | 4.4301369 | 1,819.09 |
| 119. | 46526 | 11/10/77 | 2/8/78 | 534.60 | 4.4301369 | 189.47 |
| 120. | 46562 | 11/11/77 | 2/9/78 | 108.50 | 4.4273972 | 38.43 |
| 121. | 46616 | 11/14/77 | 2/12/78 | 581.11 | 4.419178 | 205.44 |
| 122. | 46617 | 11/14/77 | 2/12/78 | 12.99 | 4.419178 | 4.59 |

| | Invoice Number | Invoice Date | Payment Due Date (90 days) | Outstanding Balance on Invoice | Interest Period (Years) | Total Interest Owed |
|---|---|---|---|---|---|---|
| 123. | 46838 | 11/17/77 | 2/15/78 | 5,394.00 | 4.4109589 | 1,903.42 |
| 124. | 46839 | 11/17/77 | 2/15/78 | 407.36 | 4.4109589 | 143.75 |
| 125. | 46840 | 11/17/77 | 2/15/78 | 102.25 | 4.4109589 | 36.08 |
| 126. | 46841 | 11/17/77 | 2/15/78 | 960.30 | 4.4109589 | 338.87 |
| 127. | 46985 | 11/23/77 | 2/21/78 | 477.91 | 4.4109589 | 168.64 |
| 128. | 47076 | 11/28/77 | 2/26/78 | 5,394.60 | 4.3808219 | 1,890.62 |
| 129. | 47132 | 11/29/77 | 2/27/78 | 13,020.00 | 4.3780821 | 4,560.21 |
| 130. | 47133 | 11/29/77 | 2/27/78 | 369.00 | 4.3780821 | 129.24 |
| 131. | 47501 | 12/6/77 | 3/5/78 | 1,510.50 | 4.3616438 | 527.06 |
| 132. | 47502 | 12/6/77 | 3/6/78 | 8,364.00 | 4.3589041 | 2,916.63 |
| 133. | 47503 | 12/6/77 | 3/6/78 | 8,364.00 | 4.3589041 | 2,916.63 |
| 134. | 47567 | 12/7/77 | 3/7/78 | 5,973.00 | 4.3561643 | 2,081.55 |
| 135. | 47568 | 12/7/77 | 3/7/78 | 379.62 | 4.3561643 | 132.29 |
| 136. | 47569 | 12/7/77 | 3/7/78 | 1,563.66 | 4.3561643 | 544.92 |
| 137. | 47613 | 12/8/77 | 3/8/78 | 976.70 | 4.3534246 | 340.16 |
| 138. | 47614 | 12/8/77 | 3/8/78 | 12.99 | 4.3534246 | 4.52 |
| 139. | 48309 | 12/23/77 | 3/23/78 | 492.29 | 4.3123287 | 169.83 |
| 140. | 48310 | 12/23/77 | 3/23/78 | 2,217.60 | 4.3123287 | 765.04 |
| 141. | 48311 | 12/23/77 | 3/23/78 | 891.00 | 4.3123287 | 307.38 |
| 142. | 48312 | 12/23/77 | 3/23/78 | 718.50 | 4.3123287 | 247.87 |
| 143. | 48351 | 12/27/77 | 3/27/78 | 128.20 | 4.3013698 | 44.11 |
| 144. | 48352 | 12/27/77 | 3/27/78 | 194.91 | 4.3013698 | 67.07 |
| 145. | 48353 | 12/27/77 | 3/27/78 | 483.29 | 4.3013698 | 166.30 |
| 146. | 48402 | 12/28/77 | 3/28/78 | 2,025.30 | 4.2986301 | 696.48 |
| 147. | 48497 | 12/30/77 | 3/30/78 | 942.00 | 4.2931506 | 323.53 |
| 148. | 48498 | 12/30/77 | 3/30/78 | 1,680.00 | 4.2931506 | 577.00 |
| 149. | 49000 | 1/23/78 | 4/23/78 | 295.40 | 4.2273972 | 99.90 |
| 150. | 49101 | 1/23/78 | 4/23/78 | 235.00 | 4.2273972 | 79.48 |
| 151. | 48728 | ------- | 5/18/78 | 54,945.00 | 4.1589041 | 18,280.88 |
| | (Waban Parkas) | | (date of commencement of the action) | | | |
| 152. | 35985 | 1/5/77 | 4/5/77 | 287.61 | 5.2767123 | 121.41 |
| 153. | 36023 | 1/6/77 | 4/6/77 | 12.71 | 5.2739726 | 5.36 |
| 154. | 36414 | 1/13/77 | 4/13/77 | 5.04 | 5.2547945 | 2.12 |
| 155. | 37203 | 2/2/77 | 5/3/77 | 72.74 | 5.2 | 30.26 |
| 156. | 39990 | 4/14/77 | 7/13/77 | 28.50 | 5.0054794 | 11.41 |
| 157. | 43202 | 7/18/77 | 10/16/77 | 1,532.70 | 5.7452054 | 581.84 |
| 158. | FC031 | 8/31/77 | 11/29/77 | 40.38 | 4.6328767 | 14.96 |
| 159. | 44722 | 9/6/77 | 12/5/77 | 201.56 | 4.5506849 | 73.38 |
| 160. | 44961 | 9/15/77 | 12/14/77 | 711.29 | 4.5835616 | 260.82 |
| 161. | 45960 | 10/24/77 | 1/22/78 | 757.93 | 4.4767123 | 271.44 |
| 162. | 46707 | 11/15/77 | 2/13/78 | 13.34 | 4.4164383 | 4.71 |
| 163. | 47779 | 12/13/77 | 3/23/78 | 11.95 | 4.3123287 | 4.12 |
| 164. | 47852 | 12/14/77 | 3/14/78 | 1,162.80 | 4.3287671 | 402.68 |
| 165. | 48088 | 12/19/77 | 3/19/78 | 338.80 | 4.3232876 | 117.18 |
| 166. | 48354 | 12/27/77 | 3/27/78 | 241.80 | 4.3013698 | 83.21 |
| 167. | 37081 | 1/31/77 | 5/1/77 | 23.21 | 5.2054794 | 9.67 |
| 168. | 37202 | 2/2/77 | 5/3/77 | 25.59 | 5.2 | 10.65 |
| 169. | 38452 | 3/3/77 | 6/1/77 | 27.15 | 5.1205479 | 11.12 |
| 170. | 40399 | 4/24/77 | 7/23/77 | 1,888.50 | 4.9780821 | 752.09 |
| 171. | FC031 | 8/31/77 | 11/29/77 | 38.22 | 4.6328767 | 14.17 |
| 172. | 44495 | 9/1/77 | 11/30/78 | 367.80 | 4.6219178 | 136.0 |
| 173. | 44964 | 9/15/77 | 12/14/77 | 1,357.20 | 4.5835616 | 497.66 |
| 174. | 44494 | 10/1/77 | 12/30/77 | 1,377.00 | 4.539726 | 500.10 |

| Invoice Number | Invoice Date | Payment Due Date (90 days) | Outstanding Balance on Invoice | Interest Period (Years) | Total Interest Owed |
|---|---|---|---|---|---|
| 175. 31591 | 10/6/76 | 1/4/77 | 1,534.63 | 5.5260273 | 678.43 |
| 176. 48250 | 12/22/77 | 3/22/78 | 600.48 | 4.3150684 | 207.29 |
| 177. 48307 | 12/23/77 | 3/23/78 | 94.20 | 4.3123287 | 32.50 |
| 178. 48308 | 12/23/77 | 3/23/78 | 471.00 | 4.3123287 | 162.49 |
| 179. 37083 | 1/31/77 | 5/1/77 | 23.31 | 5.2054794 | 9.71 |
| 180. 38290 | 2/28/77 | 5/29/77 | 24.74 | 5.1287671 | 10.15 |
| 181. 40402 | 4/24/77 | 7/23/77 | 498.50 | 4.9780821 | 198.53 |
| 182. 42930 | 7/5/77 | 10/3/77 | 398.77 | 4.7808219 | 152.52 |
| 183. 43115 | 7/14/77 | 10/12/77 | 625.80 | 4.7561643 | 238.11 |
| 184. 44457 | 8/25/77 | 11/23/77 | 462.00 | 4.6410958 | 171.53 |
| 185. 44456 | 8/25/77 | 11/23/77 | 462.00 | 4.6410958 | 171.53 |
| 186. 37085 | 1/31/77 | 5/1/77 | 17.27 | 5.2054794 | 7.19 |
| 187. 45957 | 10/24/77 | 1/22/78 | 425.33 | 4.4767123 | 152.33 |
| 188. FC031 | 8/31/77 | 11/29/77 | 10.48 | 4.6273972 | 3.88 |
| | | | | TOTAL | $103,000.36 |

## APPENDIX B

| Credit Memo Number | | Credit Memo Date | Amount | Interest Period (Years) | Total Interest Owed |
|---|---|---|---|---|---|
| 1. 10940 | | 9/29/76 | $ 8.18 | 5.7917808 | $ 3.79 |
| 2. 10942 | | 9/29/76 | 3.90 | 5.7917808 | 1.81 |
| 3. 11587 | | 4/20/77 | 15.30 | 5.2356164 | 6.41 |
| 4. 11654 | | 5/6/77 | 1.48 | 5.1917808 | .61 |
| 5. 11809 | | 6/28/77 | 91.80 | 5.0465753 | 37.06 |
| 6. 12457 | | 11/23/77 | 1,935.68 | 4.6410958 | 718.69 |
| 7. 12478 | | 11/23/77 | 1,183.24 | 4.6410958 | 439.32 |
| 8. 12479 | | 11/23/77 | 1,746.16 | 4.6410958 | 648.33 |
| 9. 12480 | | 11/23/77 | 2,410.40 | 4.6410958 | 894.95 |
| 10. 12481 | | 11/23/77 | 1,819.76 | 4.6410958 | 675.65 |
| 11. 12264 | | 9/9/77 | 31.50 | 4.8465753 | 12.21 |
| 12. 27914 | | 9/29/76 | 1.52 | 5.7917808 | .70 |
| 13. 37138 | (inv.) | 2/1/77 | 1,523.30 | 5.449315 | 664.08 |
| 14. 00112 | | 9/29/76 | 1.88 | 5.7917808 | .87 |
| 15. 72977 | | 9/29/76 | 2.00 | 5.7917808 | .93 |
| 16. 1259 | | 1/5/78 | 8,476.80 | 4.5232876 | 3,067.44 |
| | | | | TOTAL | $7,172.85 |

## APPENDIX C

| | Amount of Pre-Judgment Interest Owed EMS |
|---|---|

1. *Waban Parkas*
 Amount of Profits Lost by EMS as a Result of the Breaches = [$115,625.00 (projected gross sales) x .94 (amount of gross sales EMS would have realized after normal markdowns)] − $91,671.00 (actual gross sales) = $17,016.50
 $17,016.50 x .08 (statutory interest rate) x 4.1589041 (interest period expressed in years) = $5,661.60

2. *Down Goods*
 Amount of Profits Lost by EMS as a Result of the Breaches = $151,295.90 (total amount of profits lost by

EMS) – $17,016.50 (amount of profits lost by EMS on Waban Parkas) = $134,279.40
+ Amount Expended by EMS in Issuing Refunds to Customers and Conducting Recall Campaign = 32,041.00

Total Damages $166,320.40

$166,320.40 x .08 (statutory interest rate) x 5.2712328 (interest period expressed in years) = $70,137.08

3. *Advertising credit*
$25,000 x .08 (statutory interest rate) x 5.1013698 (interest period expressed in years) = $10,202.74

TOTAL $86,001.42